Chelsea Stewart-Fusek, OSB # 224994
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211
(971) 717-6425
cstewartfusek@biologicaldiversity.org

Tala DiBenedetto (seeking admission *pro hac vice*)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 371
Oceanside, NY 11572-0371
(718) 874-6734, ext. 555
tdibenedetto@biologicaldiversity.org

Collette L. Adkins (seeking *admission pro hac vice*)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 595
Circle Pines, MN 55014-0595
(651) 955-3821
cadkins@biologicaldiversity.org

*Attorneys for Plaintiff Center for Biological Diversity*

## UNITED STATES DISTRICT COURT FOR THE

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY**, a non-profit organization,<br><br>Plaintiff,<br><br>v.<br><br>**U.S. FOREST SERVICE; TOM VILSACK**, in his official capacity as Secretary of the U.S. Department of Agriculture; **REBECCA BROOKE**, in her official capacity of Forest Supervisor for the Siuslaw Forest.<br><br>Defendants. | Case No. _____<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

COMPLAINT – 1

**INTRODUCTION**

1.        Plaintiff Center for Biological Diversity brings this action under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq*.; the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq*.; the National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600 *et seq*.; the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq*.; and implementing regulations established pursuant to these federal statutes.

2.        The coastal distinct population segment ("DPS") of Pacific marten (*Martes caurina*) – a small, ferocious weasel-like animal with triangular ears and a bushy tail – was listed as threatened under the ESA in 2020. Since then, the United States Forest Service ("Forest Service") has allowed rampant, unchecked off-highway vehicle ("OHV") use in the Oregon Dunes National Recreation Area ("Oregon Dunes" or "Dunes") without completing required ESA consultation, performing requisite environmental analysis to assess risks to threatened coastal martens, or ensuring its actions comply with relevant land management plans.

3.        Despite its failure to timely complete legally required consultation and environmental analysis, and while recognizing the sensitivity of the marten population in the Oregon Dunes, the Forest Service has and, on information and belief, will continue to authorize and expand OHV activity and issue special use permits for large, disruptive OHV events in and near marten habitat.

4.        The failure of the Forest Service to reinitiate and complete reinitiated consultation with the U.S. Fish and Wildlife Service ("FWS") regarding its continued authorization of the off-highway OHV activity in the Oregon Dunes violates their procedural and substantive obligations under Sections 7(a)(2) of the ESA, as does the Forest Service's failure to initiate and complete consultation on special use permits for upcoming OHV events in the

COMPLAINT – 2

Oregon Dunes, including 2024 UTV Takeover events in Coos Bay and Winchester Bay, and the upcoming 2024 and 2025 DuneFest. By continuing to issue special use permits for large OHV events in and near coastal marten habitat in the Oregon Dunes – including the first-ever UTV Takeover event in Winchester Bay – without completing Section 7(a)(2) consultation, the Forest Service has irretrievably committed resources and foreclosed the formulation or implementation of any reasonable and prudent alternative measures, in violation of Section 7(d) of the ESA. 16 U.S.C. § 1536(d).

5.      The Forest Service also violated NEPA by wrongly relying on a "categorical exclusion" without conducting the requisite scoping, and where extraordinary circumstances are present, instead of conducting an environmental assessment ("EA") or environmental impact statement ("EIS"), thereby short-circuiting public involvement and the consideration of mitigations for any permitting of large OHV events such as DuneFest and the UTV Takeover.

6.      In issuing these special use permits, the Forest Service additionally violated NFMA by failing to ensure these authorizations comply with relevant land management plans governing the Oregon Dunes: the Siuslaw Forest Plan and Oregon Dunes Plan.

7.      Due to rampant OHV use on the Oregon Dunes authorized by the Forest Service, coastal martens are exposed to countless threats from, among other things, vehicle strikes and habitat disturbance from OHVs tearing through marten habitat and corridors, which martens need to live, breed, search for food and hide from predators. Near-constant OHV activity during busy periods also exposes martens to high levels and quantities of anthropogenic noise, which can significantly interfere with essential behaviors such as breeding, feeding and sheltering, especially during sensitive periods like when mothers give birth and early kit rearing.

COMPLAINT – 3

8.      As a result of the Forest Service's actions, inactions and legal violations, over three years have passed and federally listed coastal martens remain vulnerable to various harmful impacts of rampant, unchecked OHV activity in and near their habitat.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 16 U.S.C. § 1540(g)(1)(A) (ESA citizen suit provision) and 5 U.S.C. § 702 (Administrative Procedure Act). The Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202 and 5 U.S.C. § 706(2).

10.      The Center provided Defendants with at least 60 days notice of the ESA violations alleged herein as required by 16 U.S.C. § 1540(g)(2)(A). Defendants have not remedied the violations set out in that 60-day written notice.

11.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) and 16 U.S.C. § 1540(g)(3)(A) because (1) a substantial part of the agency's violations of law occurred and continue to occur in this district, and (2) injury to Plaintiff and its members occurred and continues to occur in this district.

## PARTIES

12.      Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a national, non-profit conservation organization that works through science, law and the media to protect imperiled species and their habitats. The Center has nearly 80,000 members nationally and nearly 3,000 in Oregon, including many who live and recreate in the Oregon Dunes. The Center is headquartered in Tucson, Arizona, and has an office in Portland, Oregon. In 2020, in response to a 2010 petition from the Center, FWS listed the coastal DPS of the Pacific marten as threatened. Previously, FWS issued a finding that listing was not warranted, and the Center

successfully challenged that finding. After the deciding court remanded the not-warranted finding in 2017, in 2020, the Center sued FWS over its failure to issue a timely final determination on the proposed coastal marten listing. Additionally, prior to the martens' listing, the Center petitioned to protect martens from trapping in Oregon, including in the Oregon Dunes. Mostly recently, the Center sued FWS over the agency's failure to finalize critical habitat for coastal martens, resulting in a settlement securing a critical habitat deadline of May 23, 2024.

13.      Plaintiff's individual members live near and regularly use the Oregon Dunes for recreational pursuits, including wildlife viewing, hiking, biking and aesthetic enjoyment. These members have set out to observe coastal martens in the Oregon Dunes and have specific intentions to continue to do so frequently and on an ongoing basis in the future. These individuals derive recreational, scientific, educational, aesthetic, moral, spiritual and other benefits from their interactions with coastal martens, signs of the animals' presence, and coastal marten habitat.

14.      For example, Center member and Oregon resident Larry S. Mangan is a retired federal wildlife biologist. He has lived near the Oregon Dunes for over thirty-six years and has continuously and regularly used the Dunes for hiking, bike riding, birdwatching and wildlife viewing. In addition to viewing coastal martens on his property, he has made and plans to continue making regular trips to the Oregon Dunes to observe coastal martens, their habitat and their signs. As a retired wildlife biologist, Larry derives significant recreational, spiritual and aesthetic enjoyment from observing wildlife and wants to see the Oregon Dunes managed in a manner that protects federally listed coastal martens. Since moving to the area, Larry and his wife Sylvia – who is also a Center member – regularly take their two children to the Oregon Dunes, and now regularly take their grandchildren as well. He feels the Oregon Dunes would be

an entirely different place without the martens and wants his children and grandchildren to continue to have the opportunity to view coastal martens in the Dunes.

15.     Because Plaintiff's members seek to view wild martens and signs of their presence in the Oregon Dunes, they are harmed by the Forest Service's actions and inactions that limit protections for – and stymie recovery of – these martens.

16.     Plaintiff's members who live in and near the Dunes are harmed by rampant OHV activity. For example, residents and individuals who use the Dunes for non-motorized recreation are harmed by the excessive noise, and the reduced safety and suitability of the Oregon Dunes for other types of recreation like hiking and wildlife viewing. Further, the lack of protections for coastal martens from rampant OHV activity reduces the number of coastal martens for members to observe and shrinks the marten's occupied range, where Plaintiff's members could observe them.

17.     As such, the Forest Service's actions and the legal violations alleged in this Complaint cause direct injury to the aesthetic, conservation, economic, recreational, scientific, educational, wildlife preservation and other interests of Plaintiff and its members.

18.     Plaintiff and its members also have a procedural interest in ensuring Defendants comply with all applicable laws, regulations and procedures pertaining to the management of national forest lands. Plaintiff has worked to protect coastal martens in the Oregon Dunes and throughout their current range. Plaintiff and its members have an interest in preventing the Forest Service from authorizing activities that would take listed martens and threaten their continued existence in the Oregon Dunes. The relief requested in this litigation would further that goal by requiring NEPA analysis and ESA consultation that consider the harm caused by authorized OHV activity on coastal martens in the Oregon Dunes, increasing

Plaintiff's understanding of such impacts and aiding its continued efforts to protect and advocate for the martens.

19.     Further, if the Forest Service had complied with its legal duties under NEPA, it would have allowed Plaintiff and its members the opportunity to participate in public commenting on the proposed special use permits and prepared an EA or EIS with a range of alternatives, thereby undertaking a more thorough environmental analysis and minimizing or averting the harm to Plaintiff's members that will be caused from the OHV activity authorized via special use permits for large OHV events in the Oregon Dunes.

20.     Plaintiff and its members' interest have been, are being and – unless their requested relief is granted – will continue to be adversely and irreparably injured by the Forest Service's failure to comply with federal law. These are actual, concrete injuries, traceable to the Defendants' conduct, that would be redressed by the requested relief. Specifically, if the Court were to order the Forest Service to reinitiate and complete consultation on the 10(C) Project, complete consultation on and engage in environmental analysis of special use permits for DuneFest and UTV Takeover and ensure its actions in issuing these permits comply with the Siuslaw Forest Plan and Oregon Dunes Plan, Plaintiff and its members' injuries would be redressed. Plaintiff has no other adequate remedy at law.

21.     Defendant THOMAS VILSACK is the United States Secretary of Agriculture. In that capacity, Secretary Vilsack has supervisory responsibility over the United States Forest Service. Secretary Vilsack is sued in his official capacity.

22.     Defendant REBECCA BROOKE is sued in her official capacity as the Supervisor of the Siuslaw National Forest. She is directly responsible for forest management in

the Siuslaw National Forest and for ensuring that all resource management decisions comply with applicable laws and regulations.

23.    Defendant U.S. Forest Service is a federal government agency within the Department of Agriculture, which holds the National Forests in trust for the American people and is responsible for actions in the Siuslaw National Forest, which encompasses the Oregon Dunes National Recreation Area.

## LEGAL BACKGROUND

### A.  The Endangered Species Act

24.    Congress enacted the ESA, in part to provide a "means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b). The ESA vests primary responsibility for administering and enforcing the statute with the Secretaries of Commerce and Interior. 50 C.F.R. § 402.01(a). The Interior Secretary has delegated this responsibility to FWS for freshwater and terrestrial species, including the coastal marten. *Id*. § 402.01(b).

25.    Section 2(c) of the ESA establishes that it is "the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of [the ESA]." 16 U.S.C. § 1531(c)(1). The ESA defines "conservation" to mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary." *Id*. § 1532(3).

26.    The ESA establishes strict standards that require the Forest Service to carefully evaluate and/or mitigate the impacts of its actions. When a species has been listed or

critical habitat designated under the ESA, all federal agencies – including the Forest Service –
must ensure through consultation with FWS that their programs and activities comply with the
ESA. *Id*. § 1536(a)(2). Through consultation under Section 7 of the ESA, federal agencies work
with FWS to determine whether their actions will jeopardize listed species' survival or adversely
modify designated critical habitat, and if so, to identify ways to modify the action to avoid that
result. 50 C.F.R. § 402.14(g). An agency is required to review its actions "at the earliest possible
time" to determine whether the action may affect listed species or critical habitat. *Id*. § 402.14(a).
"'May affect' is broadly understood," and includes "*[a]ny possible effect,* whether beneficial,
benign, adverse or of an undetermined character." *NRDC v. EPA*, 38 F.4th 34, 53 (9th Cir. 2022)
(internal citations omitted).

27.     For each federal action, the Forest Service must ask FWS whether any
listed or proposed species may be present in the area of the agency action. If listed or proposed
species may be present, the Forest Service must prepare a "biological assessment" to determine
whether the listed species may be affected by the proposed action. 16 U.S.C. § 1536(c)(1); 50
C.F.R. § 402.12.

28.     The biological assessment must include, among other things, "[a]n
analysis of the effects of the action on the species and habitat, including consideration of
cumulative effects, and the results of any related studies." 50 C.F.R. § 402.12(f)(4). It must
generally be completed within 180 days. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(i).

29.     If the agency determines that its action is "likely to adversely affect" a
listed species or critical habitat, or if FWS does not concur with the agency's "not likely to
adversely affect" determination, the agency must engage in "formal consultation," as outlined in
50 C.F.R. § 402.14 ("Formal Consultation"). 50 C.F.R. § 402.14(a). An agency is relieved of the

obligation to consult on its actions only where the action will have "no effect" on listed species or designated critical habitat. Effects determinations are based on the direct, indirect and cumulative effects of the action when added to the environmental baseline and other interrelated and interdependent actions. 50 C.F.R. § 402.02 (defining "[e]ffects of the action").

30.      To complete formal consultation, the FWS must provide the Forest Service with a "biological opinion" explaining how the proposed action will affect the listed species or habitat. 16 U.S.C. § 1536(b); 50 C.F.R. § 402.14(e). Consultation must generally be completed within 90 days from the date on which consultation is initiated. 16 U.S.C. § 1536(b)(1)(A); 50 C.F.R. § 402.14(e).

31.      If FWS concludes that the proposed action "will jeopardize the continued existence" of a listed species, the biological opinion must outline "reasonable and prudent alternatives." 16 U.S.C. §§ 1536(a)(4), (b)(3)(A). If the biological opinion concludes that the action is not likely to jeopardize the continued existence of a listed species, and will not result in the destruction or adverse modification of critical habitat, the FWS must provide an "incidental take statement," specifying the amount or extent of such incidental taking on the listed species, any "reasonable and prudent measures" that the FWS considers necessary or appropriate to minimize such impact, and setting forth the "terms and conditions" that must be complied with by the Forest Service to implement those measures. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). Taking of listed species without the coverage of an incidental take statement is a violation of Section 9 of the ESA. 16 U.S.C. § 1538.

32.      The action agency and FWS must reinitiate consultation on agency actions over which the action agency retains, or is authorized to exercise, discretionary involvement or control:

1) If the amount or extent of taking specified in the incidental take statement is exceeded;

2) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;

3) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or

4) If a new species is listed or critical habitat designated that may be affected by the identified action.

50 C.F.R. § 402.16(a).

33.     Furthermore, once the agencies initiate or reinitiate consultation, under Section 7(d) the action agency shall not make any irretrievable commitment of resources with respect to the agency action, which has the effect of "foreclosing the formulation or implementation of any reasonable and prudent measures which would not violate subsection (a)(2) of this section." 16 U.S.C. § 1536(d). Congress enacted this provision "to ensure that the status quo would be maintained during the consultation process, to prevent agencies from sinking resources into a project in order to ensure its completion regardless of its impacts to endangered species." *Wash. Toxics Coal. v. EPA*, 413 F.3d 1024, 1034-35 (9th Cir. 2005). This prohibition remains in force during the consultation process and continues until the requirements of Section 7(a)(2) are satisfied. 50 C.F.R. § 402.09.

34.     Under Section 9 of the ESA, it is unlawful for any person to "take" an endangered species. 16 U.S.C. § 1538(a)(1)(B). To "take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct. *Id.* § 1532(19). "Harass" under the Act refers to "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or

sheltering," while "harm" refers to "an act which actually kills or injures wildlife [ including] significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." *See* 50 C.F.R. § 17.3. "Take" includes direct as well as indirect harm and need not be purposeful. *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon*, 515 U.S. 687, 704 (1995). The term is "defined in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife." *Id*.

### B. The National Environmental Policy Act

35.        NEPA lays out "a national policy [to] encourage productive and enjoyable harmony between man and his environment." 42 U.S.C. § 4321. It requires agencies to evaluate and publicly disclose the potential environmental impacts of proposed actions. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 371 (1989).

36.        NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); *see also* 40 C.F.R. § 1500.1(a). "Major federal action" includes activities or decisions subject to federal control and responsibility. 40 C.F.R. § 1508.1(q). Such "actions" include "new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies." *Id*. § 1508.1(q)(2). Human environment shall be interpreted "comprehensively" to include "the natural and physical environment and the relationship of present and future generations… with that environment." *Id*. § 1508.1(m).

37.        To determine whether an action is significant – i.e., whether an EIS is necessary for the proposed action – if the proposed action is not categorically excluded, the

Council for Environmental Quality ("CEQ") regulations require an agency first to prepare an EA. *Id*. §§ 1501.3(a)(2), 1501.5(a). An EA must identify the direct, indirect and cumulative impacts of each reasonable alternative, including a project's ecological, aesthetic, economic, social and health effects. *Id*. §§ 1508.1(g)(3) (defining "cumulative effects"), 1508.1(g)(4) (defining "effects"), 1501.5(c)(2) (requiring EAs to disclose "the environmental impacts of proposed action and alternatives").

38.    Significance determinations are governed by CEQ regulations, which require agencies to consider effects that are both short- and long-term, beneficial and adverse, effects on public health and safety, and those that would violate environmental laws. *Id*. § 1501.3(b)(2). If the agency determines that a full EIS is not necessary, the agency must prepare a finding of no significant impact ("FONSI"). 40 C.F.R. § 1501.5(c)(1). A FONSI is a "document . . . briefly presenting the reasons why [the proposed] action . . . will not have a significant effect on the human environment." *Id*. § 1508.1(l).

39.    In undertaking environmental analysis, each agency must consider environmental impacts including direct, indirect and cumulative effects. *Id*. § 1508.1(g)(1)-(3). Cumulative impacts are defined as "effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id*. § 1508.1(g)(3). They can result from "individually minor but collectively significant actions taking place over a period of time." *Id*.

40.    In addition, when conducting environmental analysis pursuant to an EA or EIS, an agency must consider alternatives to the proposed action. *Id*. §§ 1501.5(c)(2), 1502.1.

41.     NEPA requires agencies to develop procedures to implement the Act. 40 C.F.R. § 1507.3(c). These procedures permit agencies to establish specific categories of actions that "normally do not have a significant effect on the human environment," known as "categorical exclusions." *Id.* §§ 1508.1(d), 1507.3(e)(2)(ii). For these categories of actions, the agency need not prepare an EA or EIS, but only if no "extraordinary circumstances" exist related to the proposed action. 36 C.F.R. § 220.6.

42.     Scoping is required for all Forest Service proposed actions, including those that would appear to be categorically excluded from further analysis and documentation in an EA or an EIS. 36 C.F.R. § 220.4(e)(1). Such scoping must be carried out in accordance with the requirements of 40 C.F.R. § 1501.7.  36 C.F.R § 220.4(e)(2).

43.     "Resource conditions that should be considered in determining whether extraordinary circumstances related to a proposed action warrant further analysis and documentation in an EA or an EIS" include "[f]ederally listed threatened or endangered species or designated critical habitat, species proposed for Federal listing or proposed critical habitat, or Forest Service sensitive species;" and "Congressionally designated areas, such as wilderness, wilderness study areas, or *national recreation areas*." 36 C.F.R. §§ 220.6(b)(1)(i), (iii) (emphasis added).

44.     If there is "a cause-effect relationship between a proposed action and the potential effect on these resource conditions[,…] the degree of the potential effect of a proposed action on these resource conditions that determines whether extraordinary circumstances exist." *Id*. § 220.6(b)(2).

**C.  The National Forest Management Act**

45.      NFMA establishes the statutory framework for management of the
National Forest System. 16 U.S.C. §§ 1600 *et seq*. It imposes both procedural and substantive
requirements on the Forest Service's management of national forests. *Hapner v. Tidwell*, 621
F.3d 1239, 1246 (9th Cir. 2010).

46.      Procedurally, NFMA requires the Forest Service to develop a Land and
Resource Management Plan ("Forest Plan" or "land management plan") for each national forest,
including the Siuslaw Forest. A forest plan provides for multiple use management of the national
forest including outdoor recreation, range, timber, wildlife and fish, and wilderness. 16 U.S.C. §
1604(e)(1). Substantively, NFMA requires that the forest plans adopted by the Service provide
certain protections, such as protection of forest habitat and diversity of wildlife." *Id*. §
1604(g)(3).

47.      NFMA also requires that "[r]esource plans and permits, contracts, and
other instruments for the use and occupancy of National Forest System lands… be consistent
with the land management plans." 16 U.S.C. § 1604(i). To that end, "[e]very project and activity
must be consistent with the applicable plan components. A project or activity approval document
must describe how the project or activity is consistent with applicable plan components." 36
C.F.R. § 219.15(d).

48.      "A project is consistent if it conforms to the applicable 'components' of
the forest plan, including the standards, guidelines, and desired conditions that are set forth in the
forest plan and that collectively establish the details of forest management." *All. for the Wild
Rockies v. United States Forest Serv.*, 907 F.3d 1105, 1110 (9th Cir. 2018).

**D.  The Administrative Procedure Act**

49.     Pursuant to the APA, a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. 5 U.S.C. § 702.

50.     "Agency action made reviewable by statute and final agency actions for which there is no adequate remedy in court are subject to judicial review." *Id*. § 704.

51.     The APA directs a court to "compel agency action unlawfully withheld or unreasonably delayed;" and to hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or agency action that is undertaken "without observance of procedure required by law." *Id*. §§ 706(1), 706(2)(A), (D).

## FACTS

### **Coastal Martens**

52.     Martens are a small carnivore in the Mustelidae family with long, narrow bodies (resembling other mustelids, such as weasels, minks, otters and fishers), large triangular ears and bushy tails. Coastal martens were thought to be extinct until they were rediscovered in the 1990s in northern California, with a smaller population discovered later in the Oregon Dunes.

53.     In 2020, in response to a 2010 petition from the Center, FWS listed the coastal DPS of the Pacific marten as threatened. Surveys indicate that less than 400 coastal martens remain in four isolated population segments.

54.     Coastal martens live in only three areas in the Pacific Northwest: one population is in Northern California, and two remote populations are in Oregon, including the Oregon Dunes. In central coastal Oregon, coastal martens inhabit shore pine forests with dense

ericaceous understory due to the abundance and diversity of marten prey species, compared to that of nearby interior forests.

55.     Martens are voracious, opportunistic eaters and will prey on anything from deer mice and voles to larger prey like rabbits and birds. They may also eat berries and other foods if prey animals are not readily available. They are most active and do most of their hunting at night.

56.     Martens typically bear 1 to 5 young in the spring (often between March and May), after which nursing lasts about 6 weeks, and the young do not become independent until late summer. Studies indicate that the 2-3 months after birth are "a critical and sensitive period for both female Pacific Martens and their kits."

57.     Coastal martens are generally solitary except during mating and when females are raising young and establish home ranges in areas that provide enough habitat to support their life-history needs. They are territorial, with dominant males maintaining home ranges that encompass one or more females' home ranges. Martens have a slow reproductive output and live less than five years in the wild.



*Coastal marten photo by Mark Linnell, U.S. Forest Service*

COMPLAINT – 17

58.     Coastal martens face significant threats from, among other things, habitat degradation – which has led to decreased connectivity among populations and competition from generalist predators – human disturbance and vehicle strikes. Genetic diversity is important to maintain the coastal marten's capacity to adapt to future environmental changes. Neither of the Oregon populations has functional connectivity to any other population, and if an unexpected or catastrophic event eliminated either population, natural recolonization from the California populations would not be feasible.

59.     The Forest Service understands the vulnerability of the costal marten population in the Oregon Dunes. Prior to the marten's listing, the agency acknowledged in its Environmental Assessment of the Oregon Dunes Restoration Project (which did not assess impacts of OHV activity on martens) that:

> [t]he existing marten population on the central Oregon coast is vulnerable to extirpation due to its small size (an estimated 71 adults) and its apparent isolation from other populations. Linnell's recently published population viability analysis determined that the extinction risk for either of the two Oregon Dunes [National Recreation Area] subpopulations strongly increases with even a small amount (2-3) of annual human-caused mortalities. Any increase in human-caused mortality is expected to negatively impact the population. Fragmentation and loss of habitat within this marten home range could cause the loss of individual marten and therefore would likely… cause a loss of viability to the population or species.

60.     As of March 2020, the coastal marten population on the Oregon Dunes was estimated at 71 individuals across two subpopulations – 42 martens north of the Umpqua River and 29 martens south of it – if all available habitat is able to be occupied.

61.     In 2021, FWS proposed to designate 1,413,305 acres of critical habitat for the coastal marten in northwest California and southwestern Oregon. FWS was expected to finalize the designation by December 2023. Pursuant to a settlement in connection with litigation

brought by the Center, a new deadline for the agency to finalize critical habitat was set for May 23, 2024.

62.        On May 29, 2024, FWS designated approximately 1.2 million acres of critical habitat for the marten, including 28,843 acres in the Oregon Dunes National Recreation Area, comprising virtually the entire Oregon Dunes.

**<u>Management of the Oregon Dunes National Recreation Area</u>**

63.        The Oregon Dunes was established to provide for "public outdoor recreation" and the "conservation of scenic, scientific, historic, and other values." 16 U.S.C. § 460z. It consists of temperate coastal sand dunes, forests, and ocean spanning over a 31,500-acre portion of the Siuslaw National Forest.

64.        The Oregon Dunes is home to two federally listed species, the western snowy plover (*Charadrius nivosus*) and the coastal marten.

65.        Management of the Oregon Dunes is governed by a 1994 Oregon Dunes Management Plan[1] and the 1990 Forest Plan for the Siuslaw National Forest.[2] The Forest Plan has been amended sixteen times since 1992, but the Oregon Dunes Plan has not been substantially revised since its drafting in 1994.

66.        The Siuslaw Forest Plan sets out a Forest Management Goal of "[p]rovid[ing] diverse habitats that will support viable populations of all native and desirable introduced wildlife," as well as "habitat needed to aid recover of Threatened and Endangered species in accordance with approved plans." Siuslaw Forest Plan, *supra* note 2, at Ch. IV-I.

---

[1] U.S. Forest Service, *Management Plan – Oregon Dunes National Recreation Area, Siuslaw National Forest* (1994) ("Oregon Dunes Plan").
[2] U.S. Forest Service, *Land and Resource Management Plan – Siuslaw National Forest* (1990) ("Siuslaw Forest Plan").

67.     Both the Siuslaw Forest Plan and the Oregon Dunes Plan set forest-wide standards for the conservation of endangered, threatened and sensitive species. For example, they direct the Forest Service to restrict or prohibit types of motor vehicles off roads where not already restricted "if needed to protect resources, provide for public safety, or minimize conflicts among users" (FW-007). *Id*. at Ch. IV-40; Oregon Dunes Plan, *supra* note 1, at Ch. III-53.

68.     Additionally, the Oregon Dunes Plan established "separate management areas with differing resource emphases" within the Dunes and sets forth separate standards for the management of these designated areas. Relevant here, Management Area 10(C) ("MA 10(C)") specifies areas to be managed in a manner that "protect[s] vegetated habitats while providing controlled opportunities for O[H]V touring and traveling on designated routes," whereas Management Area 10(B) ("MA 10(B)") was meant to "provide[] O[H]V riding opportunities in undeveloped, unvegetated settings." Oregon Dunes Plan, *supra* note 1, at Ch. III-20. MA 10(B) does not restrict OHV riders to specified routes and allows open riding, "except in areas closed to protect special habitats or unique geologic features." *Id*. at Ch. III-34 (B-1).

69.     Following the 2005 Travel Management Rule, which requires national forests to designate roads, trails, and areas open to motor vehicle use, and prohibits the use of motor vehicles that are inconsistent with such designations, 36 C.F.R. § 261.13, the Siuslaw Travel Management Project was completed, which pointed towards the Oregon Dunes Management Area 10(C) Designated Routes Project ("10(C) Project") to complete designation on the Oregon Dunes.

**The 10(C) Routes Designation Project**

70.     In 2015, new designated routes were established in the Oregon Dunes under the 10(C) Project, which involved a separate environmental review and consultation process.

71.     The 10(C) Project amended Siuslaw Forest Plan to re-allocate 518 acres from Management Area ("MA") 10(C) (restricting OHV use to designated routes) to MA 10(B) (which allows open riding) and designated an additional 2.3 miles of OHV trails in MA 10(C).

72.     The Forest Service's purported rationale for redesignating certain areas of the Oregon Dunes from MA 10(C) to MA 10(B) was that the 10(C) designation was meant to protect only native vegetation, and that parts of MA 10(C) contained non-native, invasive species that "do not need protection from impacts by OHVs." Accordingly, the 10(C) Project redesignated a significant portion of vegetated land from only allowing OHVs on designated routes, to allowing open riding. However, non-native vegetation is used by coastal martens as protective coverage and forage for prey species.

73.     Moreover, areas redesignated to MA 10(B) and additional routes designated in the 10(C) Project overlap with coastal marten habitat identified by the Forest Service during the Oregon Dunes Restoration Project. For example, multiple areas redesignated from MA(C) to MA(B) under modified Alternative 4 west of Clearwater Lake (in the North riding area) overlap with marten habitat identified during the Oregon Dunes Restoration Project.

74.     The 10(C) Project and accompanying consultation with FWS took place prior to the listing of the coastal martens under the ESA, focusing only on impacts to threatened snowy plovers. Pursuant to that consultation, the Biological Opinion for the 10(C) Project recognized that designation of OHV routes and re-allocation of lands for open riding had the potential to adversely impact threatened western snowy plovers.

COMPLAINT – 21

75.    The Biological Opinion imposes mandatory ongoing reporting and monitoring requirements on the Forest Service to manage and minimize OHV impacts to threated plovers. For example, it provides that, in order to be exempt from the prohibitions of Section 9 of the ESA, the Forest Service must "[p]lan route closures and restoration in a manner that reduces exposure to OHVs and other sources of harm and disturbance, such as construction equipment and human presence." The Forest Service must also monitor OHV use and impacts on snowy plovers and submit reports to FWS.

76.    The Biological Opinion also contains a reinitiation notice that states, pursuant to 50 CFR § 402.16, reinitiation of formal consultation is required where – like here – "discretionary Federal agency involvement or control over the action has been maintained (or is authorized by law)" and "a new species is listed or critical habitat designated that may be affected by the action."

**OHV Events in the Oregon Dunes**

77.    OHV use in the Oregon Dunes has become increasingly popular since development of the 1994 Plan.

78.    In the Oregon Dunes, many riders use utility task vehicles ("UTVs"). UTVs are larger, faster, more powerful and have a more destructive environmental impact than other off-road vehicles like all-terrain vehicles or motorized bikes. UTVs often use special tires called "paddle tires" on sandy areas such as dunes, which tend to be larger, louder and more environmentally destructive.

79.    Many OHVs are additionally retrofitted with modified mufflers, which make the vehicles significantly louder.

COMPLAINT – 22

80.     Each year the Forest Service issues one or more "Special Use Permits" for OHV riding events that take place in the Oregon Dunes.

81.     Every year, the "UTV Takeover" is held along Oregon's Central Coast and marketed as the West Coast's biggest UTV event.

82.     The UTV Takeover submitted proposals for events in the Oregon Dunes between June 26-30 and September 3-8 of this year.

83.     The event website boasts over 30,000 attendees of the four "coast to coast" events; the Forest Service counted a total of 3,197 attendees that went through the event gates for UTV Takeover in Coos Bay in 2023, although it notes difficulties getting accurate numbers for certain events, so the actual number is likely higher. The Coos Bay event typically takes place in late June, however, the organizers of the Takeover have proposed an additional event in Winchester Bay in early September.

84.     According to the Forest Service, this level of OHV activity is not limited to the event but reflects activities that would "typically happen on a busy weekend in the Oregon Dunes NRA." Exceptions are the permitting of concentrated sand camping, night rides – a gathering of over 75 participants who ride through the dunes as a group at night – and an event called the "treasure hunt," which involves the posting of signs dispersed around the Oregon Dunes for participants to locate and photograph.

85.     In addition to the UTV Takeover, every year the Forest Service issues a special use permit for a large UTV event called DuneFest, which typically takes place in Winchester Bay, with several activities in the Oregon Dunes, bringing hundreds of vehicles in and near marten habitat. In previous years, organizers estimated well over 10,000 attendees. As

with the UTV Takeover, the event involves permitted activities in the Oregon Dunes, including concentrated sand camping, night rides, and a treasure hunt.

86.        Since the coastal marten was listed in 2020, special use permits for DuneFest and the UTV Takeover have continued to be issued annually. The Forest Service continues to authorize these events in the absence of any meaningful environmental analysis on the impacts of OHV activity during permitted events on coastal martens, and has not meaningfully altered these events to provide essential protections for martens, such as through area closures to protect marten habitat and corridors, enforcement of sound violations, or changing the dates of the June UTV Takeover event to reduce OHV impacts while marten kits are still dependent on their mothers. Upon information and belief, the Forest Service intends to issue or has already issued special use permits for these events in 2024. Further, upon information and belief, the agency is considering a proposal that has been submitted for DuneFest's 2025 event and will continue to issue substantially similar permits for these events in the absence of such environmental review and provision of meaningful mitigation measures implemented to protect martens.

87.        In addition to the UTV Takeover and DuneFest, the Forest Service permits other OHV events in the Oregon Dunes, such as the Northwest Grudge and the Northwest Raptor Rally.

88.        The coastal marten occurs in and near areas where the Forest Service has permitted the OHV activity – including the UTV Takeover and DuneFest – to occur. According to FWS, "surveys for marten in the action area" of the Oregon Dunes Restoration Plan, which includes Forest Service managed lands within the Oregon Dunes National Recreation Area that are west of Highway 101 within Lane, Douglas and Coos Counties "indicate a reproductive

population large enough that we assume marten habitat is likely occupied throughout." It also notes that, within the Oregon Dunes, martens are associated with forest types that are found within areas that are open to motorized recreation.

89.    Upon information and belief, the treasures hunts and night rides for DuneFest and the UTV Takeover have occurred and are proposed in and near marten habitat and corridors. For example, past and proposed permitted events for the June UTV Takeover Coos Bay event take place near marten habitat and corridors identified by the Forest Service during the Oregon Dunes Restoration project surrounding Horsfall Lake, and permitted events for the September Winchester Bay UTV Takeover and DuneFest brought OHVs in and near marten habitat west of Clear Lake and Lake Edna without any buffers to mitigate noise impacts on adjacent habitats or protective barriers to keep OHVs out of habitat.

90.    The Forest Service relies on the organizers of these events to conduct their own sound monitoring, despite receiving questionable and apparently incomplete or inaccurate sound data, or not receiving sound data for OHV events that took place in the Oregon Dunes. For example, according to documents obtained via Freedom of Information Act request, the organizers of DuneFest did not provide the required sound data for its 2023 event.

91.    The Oregon Dunes Plan set for a goal of 90 dB for OHVs starting in 1999, Oregon Dunes Plan, *supra* note 1, at Ch. III-29, but the Forest Supervisor later negotiated and agreed to a working limit of 93 dB. Accordingly, the Dunes Plan standard remains 90 dB, but the Forest Service enforces a 93 dB limit, which allows for noisier OHVs.

92.    Enforcement of user compliance with the 93 dB sound limit established by the Forest Service for the Oregon Dunes has been markedly poor. Data from 2015-2020 indicates

a 35% compliance rate, and further analysis of that data shows a 50% compliance rate for OHVs with unmodified mufflers, whereas OHVs with modified mufflers had a 12% compliance rate.

93.     The Forest Service has recognized the threats posed to coastal martens by large OHV events, noting in an email discussing the UTV Takeover that "there's no logically consistent way to arrive at a No Effect call for permitting OHV activity, during the breeding season, within occupied [marten] habitat."

94.     While the Forest Service has taken several steps to protect the snowy plover from OHV activity, such as using signage and closing areas to off-road vehicle use, it has failed to take similar measures to protect coastal martens and their habitat. For example, upon information and belief, the Forest Service has not closed any designated OHV routes to protect coastal martens or their habitat.

95.     Aerial photos of the vegetated areas within the Oregon Dunes indicate that vegetated islands possibly serving as marten habitat have been degraded by OHV use, whereas vegetated cover closed to vehicles to protect the snowy plover remain intact.



*Google Earth aerial image of the* *Umpqua Beach #3 Day Use /OHV Staging Area*

96.      The following photos taken in the Oregon Dunes on March 4, 2024, show the destruction to vegetation caused by OHVs. These photos were taken on a day with lower-than-average OHV activity, one day after a heavy rainfall. The first photo was taken of a vegetated area that the Forest Service "closed" to motorized use, located east of Sand Camp Site 95, between V8 Hill and Razorback Dune.



97.         Absent clear signage or barriers, riders destroy vegetation through user-made trails outside of designated riding areas. In its environmental analysis of the 10(C) Project, the Forest Service explained that riders seeking a challenging experience on Banshee Hill led to undercutting of native vegetation that pushed sand downhill and made the hill less steep. Riders then targeted other remaining steep areas, creating new user-created trails and destroying additional vegetated areas. Banshee Hill is located within marten habitat.

98.     While the Forest Service hoped that designating additional routes and areas open to motorized vehicles limit such resource damage and "lessen the need for signing, fencing, barricading and patrolling closed areas," the current condition of vegetated areas technically closed to OHVs in Oregon Dunes establish that this has not been the case.

99.     The two photos below depict a previously vegetated area west of the designated OHV route located between Sand Camp Sites 95 and 96.



100.     Upon information and belief, the area depicted above was once almost fully vegetated and was degraded by rampant OHV use. Damage to vegetation from OHV use appears to extend up to the fenced-off private property abutting the Oregon Dunes. Upon information and belief, martens have occurred in and near the area depicted in this photo.

COMPLAINT – 29



101.    The location depicted above was taken in the same area as the preceding photo and appears to show significant destruction from OHV use. This area was once vegetated but has been significantly deteriorated due to OHV activity. Further, upon information and belief, the treasure hunt for the upcoming June 2024 UTV Takeover includes at least one location in or near this area of the Oregon Dunes.

102.    The Forest Service has failed to adequately protect martens and marten habitat from OHV activity despite its awareness of the impacts of OHVs to vegetated areas adjacent to designated routes and within open riding areas. In a November 2023, email to Forest Service staff, a FWS biologist who surveyed the Oregon Dunes noted, "[i]t is probably challenging for riders to discern without clear signage or fencing. And paddle tires and overall larger vehicles have created more destruction than was seen in the past."

**<u>OHV Impacts to Coastal Martens</u>**

103.    Rampant OHV use, especially UTV use, is likely to destroy the marten's habitat, including potential corridors connecting marten habitats. Martens need dense cover to forage and protect themselves from predators, and crossing uncovered areas leaves them vulnerable to predation. They are territorial and have a high caloric budget relative to their size, thus they need safe, covered areas where they can spread out and look for food. Destruction of corridors makes them less likely to cross into potentially suitable habitat and leaves them vulnerable to injury or death from predation or vehicle strikes if they try to cross an uncovered area, such as an OHV route. Further, the coastal marten population in the Oregon Dunes is already among the most isolated – divided into two sub-populations separated by the Umpqua River and isolated to the east by Highway 101 – making it vulnerable to extirpation due to its small size. Decreased connectivity among coastal marten populations impedes genetic diversity and can result in inbreeding depression (reduced biological fitness resulting from inbreeding) and increase the risk of extirpation.

104.    Moreover, due to the frequency and intensity of OHV activity in the Oregon Dunes, martens are put at risk via high levels of anthropogenic noise that can significantly disrupt martens' normal behavioral patterns such as breeding, feeding, and sheltering. Abundant science shows that wildlife may perceive loud noise as a threat and react with an anti-predatory response, and loud and/or chronic noise may impede their ability to perceive environmental cues from prey, predators, or potential mates via compromised hearing, "masking" (the process by which noise interferes with an animal's ability to perceive, detect, interpret, or discriminate certain sounds) or distraction. According to the Association of Zoos and Aquariums, "[m]any mustelids" appear sensitive to loud noises, "particularly during parturition

and early kit rearing," and "[e]very effort should be made to reduce loud or unusual noises and minimize continuous vibrations during these sensitive periods."

105.    Indeed, the best available science demonstrates harmful impacts of recreation and noise on small- and mid-sized carnivores including mustelids. In a recent study, scientists exposed European mink to road noise and human voice playbacks and observed changes in activity and increased cortisol levels. In another study, wild populations of European pine marten showed that tourist pressure induced physiological responses associated with stress. Another study showed that wolverines avoided areas of both motorized and non-motorized winter recreation with off-road recreation eliciting a stronger response than road-based recreation. Other mustelids like mink, wolverines and pine martens are close relatives to the coastal marten, and thus similarly perceive and experience impacts from noise.

106.    Impacts from recreational vehicles vary depending on the intensity and duration of the disturbance. For example, a study examining impacts of off-road vehicles on American martens demonstrated that infrequent passes by singular vehicles (approximately 0.5 vehicle passes/hour) had little impact. However, OHV activity in the Oregon Dunes, especially during large events, produces consistent sound from a large quantity of vehicles.

107.    The Oregon Dunes Plan includes an Area-Wide standard ("AW-10") for "OHV Noise" that directs Forest Service to enforce "ORV noise goals of 95 decibels beginning in 1997 and 90 decibels in 1999." Oregon Dunes Plan, *supra* note 1, at Ch. III-29. Despite its recognition of the need for decibel limits on OHV activity, impacts of OHV noise on people and wildlife, and that most vehicles do not meet established decibel limits, upon information and belief, the Forest Service has done no or minimal enforcement of decibel limits during OHV events, instead opting for voluntary sound checks aimed at "raising awareness." It has even

COMPLAINT – 32

proposed to amend the Plan to raise the decibel limit to 97 decibels, although that amendment appears to be on hold.

108.    OHVs also pose an increased fire risk that threatens marten habitat. Wildfires have been recognized as a significant threat to coastal martens due to habitat destruction. In addition to campfires and illegal fireworks that occur during large UTV events, these vehicles run on gasoline, which is highly flammable, and fires from OHVs can be caused by fuel leaks, electrical issues, exhaust and engine heat, and/or improper maintenance. Just last summer, a UTV "spontaneously combusted into flames" in the Oregon Dunes. A few days later, fire officials raised the fire danger from "high" to "very high," noting an "uptick of human-caused fire" compared to the previous year.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

#### Violations of Section 7(a)(2) of the ESA

109.    Plaintiff hereby incorporates by reference the allegations presented in all preceding paragraphs.

110.    The Forest Service's failure to reinitiate and complete reinitiated consultation regarding the 10(C) Project violates its procedural and substantive obligations under Section 7(a)(2) of the ESA, as does the Service's failure to initiate and complete consultation on the upcoming permits for the UTV Takeover and DuneFest. *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.16.

111.    Section 7(a)(2) requires the agency to ensure through consultation that its actions are "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [their designated

critical] habitat." 16 U.S.C. § 1536(a)(2). This duty applies to the Forest Service's permitting, management, and authorization of OHV activity in the Oregon Dunes. The duty to reinitiate consultation is triggered by the listing of a species as threatened under the ESA, designation of their critical habitat, and identification of new information on how the action could affect listed wildlife. 50 C.F.R. § 402.16.

### The Forest Service Must Complete Reinitiated Consultation on the 10(C) Project

112.    The 10(C) Project, which designated additional OHV routes and redesignated areas within the Oregon Dunes from restricted OHV riding to open riding, is an ongoing agency action subject to the duty to reinitiate consultation, triggered by the listing of the coastal marten as threatened and designation of their critical habitat.

113.    The 10(C) Project is undoubtedly an "agency action," as it was carried out by the Forest Service, and the agency has discretion to influence or change the activity for the benefit of protected species, by for example, closing certain areas to OHVs.

114.    Further, the 10(C) Project falls under the "broad definition" of actions that "may affect" listed coastal martens and their designated critical habitat because, as explained above, the 10(C) Project redesignated identified marten habitat and corridors from MA 10(C) – restricting OHVs to designated routes – to MA 10(B), opening these areas up to open riding, including areas west of Clearwater Lake (in the North riding area). By authorizing open riding in and near marten habitat and corridors via the 10(C) Project, the Forest Service exposes listed martens and their critical habitat to OHV impacts discussed above, such as noise disturbance, physical disturbance to habitat and potential vehicle strikes.

115.    Through consultation on the 10(C) Project, FWS required the Forest Service to monitor OHV activity and impacts on listed snowy plovers, which supports its

ongoing efforts to minimize impacts of OHV impacts on plovers through reasonable measures such as closures, physical barriers, posted signs, education and enforcement.

116.    Reinitiation of consultation is necessary to extend these critical protections to martens, and to coordinate and build upon existing efforts by the Forest Service to monitor and protect listed species from OHV activity in the Oregon Dunes.

117.    In light in the coastal marten listing and designation of their critical habitat, continuing impacts to listed martens from management area redesignations made through the 10(C) Project, and the Forest Service's continuing discretion to monitor and protect listed species from OHVs, the Service must reinitiate and complete consultation on the 10(C) Project and reconsider its route designations and management area redesignations to protect marten habitats and corridors from OHVs, and extend monitoring and mitigation efforts currently in place to protected listed snowy plovers to protect listed martens.

118.    Upon information and belief, since the costal marten was listed in 2020, the Forest Service has not completed a Biological Assessment or Biological Evaluation assessing impacts to coastal martens and their habitat from the 10(C) Project, and therefore has not completed informal consultation or initiated formal consultation on the Project.

119.    Defendants are therefore violating, and will continue to violate, Section 7(a)(2) of the ESA and its implementing regulations by failing to ensure through completion of reinitiated consultation that the Forest Service's 10(C) Project does not jeopardize the continued existence of the coastal marten or adversely modify their critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.16.

**The Forest Service Must Initiate and Complete Consultation on Issuance of Special User Permits for the DuneFest and the UTV Takeover**

120.     Issuance of special use permits for DuneFest and the UTV Takeover triggers the duty to consult under the ESA. After the coastal marten was listed and critical habitat was proposed and then designated in the Oregon Dunes, the Forest Service was obligated to ensure, through consultation with FWS, that its programs and activities – including issuance of permits for DuneFest and the UTV Takeover – comply with the ESA at the "earliest possible time," to determine whether its permitting of the event may affect listed coastal martens or their critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.

121.     Upon information and belief, the Forest Service has not initiated and completed ESA consultation in relation to the issuance of the special use permits for upcoming OHV events, including DuneFest and the June and September UTV Takeover events. These events, particularly the UTV Takeover, have been exceptionally large in past years and are expected to be even larger this year. The UTV Takeover organizers have planned and, upon information and belief, the Forest Service has or will authorize a second UTV Takeover event in the Oregon Dunes at Winchester Bay. Additionally, the UTV Takeover added more than 250 campsites for its Coos Bay event. Issuance of these special use permits meet the definition of an "agency action," as they are authorizations by the Forest Service, and the agency has discretion to influence or change the activity for the benefit of protected species, such as by limiting the number of participants, changing the location of certain events, and instituting area closures to protect federally listed species.

122.     Further, activities authorized by special use permits for DuneFest and the UTV Takeover meet the low threshold of those that "may affect" listed species or their critical habitats. In addition to the impacts from OHVs explained in greater detail above – including as noise disturbance and physical disturbance to habitat – in Oregon, the most common verified

mortality source for the costal marten has been vehicular strikes along Highway 101, which runs along the eastern edge of the Oregon Dunes. Large, permitted OHV events bring thousands of vehicles into the martens' habitat and poses an undue risk of fatalities from vehicle strikes. Additionally, upon information and belief, there have been several longstanding issues with safety and direction of traffic during the event, increasing the likelihood of vehicle strike along Highway 101, as well as illegal use of fireworks that creates risk of wildfires that could destroy marten habitat.

123.    The Forest Service, through its issuance of special use permits for the UTV Takeover and DuneFest, authorizes substantial OHV activity in and near coastal marten habitat, including during the treasure hunt, which requires participants to navigate through the dunes to locate and photograph various posted signs, the series of "night rides," which involve large groups of ~100 vehicles driving through the dunes at once, and concentrated sand camping in the Oregon Dunes. Further, the night rides and concentrated sand camping occur in the evening, when martens are most active and do most of their hunting.

124.    For the June UTV Takeover Coos Bay event, the Forest Service's authorization of treasure hunts and group night rides will bring hundreds of OHVs in and near marten habitat and corridors surrounding Horsfall Lake, whereas its authorization of these events for September Winchester Bay event and upcoming DuneFest will bring OHVs in and near marten habitat west of Clear Lake and Lake Edna.

125.    During these events, there are no barriers to protect coastal marten habitat on the Oregon Dunes from OHVs, unlike in the case of the snowy plover. The timing of the Coos Bay event in late June is particularly problematic for individuals searching for mates and mothers

rearing their vulnerable young. Coastal martens begin searching for mates in late June when UTV Takeover is scheduled to occur.

126.    These threats pose an unacceptable risk of human-caused mortalities to threatened coastal martens and must be examined as soon as possible so that the Forest Service can take any actions necessary to help protect the martens, per the ESA's clear mandates.

127.    Upon information and belief, since the costal marten was listed in 2020, the Forest Service has not completed a Biological Assessment or Biological Evaluation assessing impacts to coastal martens from its issuance of special use permits for DuneFest and the UTV Takeover, and therefore has not completed informal consultation or initiated formal consultation on the permits. Nevertheless, the Forest Service has established an ongoing pattern, practice, and policy of issuing special use permits without engaging in consultation under Section 7(a)(2).

128.    Defendants are therefore violating, and will continue to violate, Section 7(a)(2) of the ESA and its implementing regulations by failing to ensure through completed consultation that special use permits for DuneFest and the UTV Takeover do not jeopardize the continued existence of the coastal marten. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.

## SECOND CLAIM FOR RELIEF

### Violation of Section 7(d) of the ESA

129.    Plaintiff hereby incorporates by reference the allegations presented in all preceding paragraphs.

130.    Section 7(d) of the ESA requires that once an agency initiates Section 7(a)(2) consultation, the agency "shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate

subsection (a)(2)." 16 U.S.C. § 1536(d); *see* 50 C.F.R. § 402.09. The purpose of Section 7(d) is to preserve the status quo and prevent harm to listed species and critical habitat during Section 7(a)(2) consultation.

131.    Upon information and belief, the Forest Service has initiated consultation or soon will initiate consultation on OHV impacts to martens living on the Oregon Dunes. Upon initiation of consultation, the Forest Service is subject to Section 7(d)'s prohibition on "irreversible or irretrievable commitment of resources." This prohibition "continues until the requirements of Section 7(a)(2) are satisfied." 50 C.F.R. § 402.09.

132.    Upon information and belief, the Forest Service has already or plans to issue special use permits for the upcoming DuneFest and UTV Takeover events, and is reviewing an application for the 2025 DuneFest, prior to satisfying Section 7(a)(2)'s procedural and substantive requirements. Further, despite the marten listing, critical habitat designation, and lack of environmental analysis on impacts to martens from OHVs in the Oregon Dunes, this year the Forest Service has or will authorize – for the first time ever – a second UTV Takeover event in the Oregon Dunes, in September in Winchester Bay.

133.    Each year, the Forest Service sells hundreds of campsites and collects thousands of dollars via issuance of special use permits for these events. Just last year, the UTV Takeover spent $75,000 on its permit and Forest Service land items like additional dumpsters, traffic control and clean-up. There is also significant early planning and expenditures involved in organizing these events, such organizing travel, sponsors and vendors. Accordingly, by continuing its pattern of authorizing large annual OHV events without completing required ESA consultation and expanding OHV activity by authorizing an addition UTV Takeover event and allowing expansion of the June Coos Bay event, the Forest Service is irreversibly and

irretrievably committing resources to the continuation and expansion of these events, which may influence the outcome of consultation.

134.    By issuing these special use permits before completing Section 7(a)(2) consultation with FWS, the Forest Service foreclosed itself from formulating or implementing reasonable and prudent alternative measures, such as area closures during OHV events, to avoid jeopardizing the marten and destroying or adversely modifying marten critical habitat. As the Forest Service explained in the EA for the Oregon Dunes Restoration Project, fragmentation and loss of habitat within Oregon Dunes could cause the loss of individual martens, and therefore would likely impair population or species viability.

135.    The Forest Services actions in issuing these permits and expanding OHV use in the Dunes also fails to maintain the status quo, and the resulting commitment of resources will harm martens and their habitat. As explained above, OHVs – especially larger vehicles like UTVs – destroy vegetation serving as marten habitat and corridors. Accordingly, authorizing OHV activity through marten habitat and corridors, including during DuneFest and the UTV Takeover, will likely cause destruction of vegetation that martens depend on to, among other things, shelter from predators, breed, and search for food and mates. Once this vegetation is destroyed, martens may be cut off from vital sources of food, shelter, mates or be separated from their kits.

136.    The Forest Service's irretrievable commitment of resources – in a manner that has or will foreclose the formulation or implementation of reasonable and prudent alternative measures to protect listed species and their critical habitats – violates Section 7(d) of the ESA, 16 U.S.C. § 1536(d), and its implementing regulations. 50 C.F.R. § 402.09.

**THIRD CLAIM FOR RELIEF**

**Violations of NEPA and the APA**

137.     Plaintiff hereby incorporates by reference the allegations presented in all preceding paragraphs.

138.     The Forest Service's failure to prepare an EA or EIS to analyze impacts from issuance of special use permits for large OHV events such as DuneFest and the UTV Takeover violates NEPA.

139.     Issuance of a special use permit for these large OHV events is a major federal action that significantly affects the human environment, considering significant environmental impacts of off-road vehicles on the environment and the presence of two federally listed species in the Oregon Dunes. 42 U.S.C. § 4332(2); 40 C.F.R. §§ 1501.3(a)(2)-(3), 1508.1.

140.     Accordingly, threats to coastal martens from habitat destruction and human disturbance – such as noise from OHVs, increased risk of vehicle strike, increased fire risk and physical disturbance to habitat and corridors – are present during large OHV events like the UTV Takeover and DuneFest, which attract thousands of individuals to marten habitat and presents significant threats from noise in the Oregon Dunes, potential for vehicle strikes, and fire risk. Any of these events may interfere with mating, cause den abandonment, and lower fitness of mothers and kits who are exposed to long-lasting disturbance, which may interfere with normal behavioral patterns, such as feeding, foraging, and defending territory.

141.     In addition to considerations of impacts to endangered species and critical habitat in accessing the significance of a federal action, 40 C.F.R. § 1501.3(b)(1), NEPA also requires consideration of "[e]ffects on public health and safety." *Id*. § 1501.3(b)(2)(iii). Large OHV events in the Oregon Dunes, particularly DuneFest the UTV Takeover, have had significant

impacts on the local community. Excessive noise from the UTV Takeover has been an ongoing issue, with many community members complaining to the Forest Service about the harmful noise resulting from the event every year.

142.    Upon information and belief, the event has historically caused several dangerous traffic issues and raised a number of safety concerns. During a meeting following the 2023 UTV Takeover, the Forest Service documented significant concern over the "poor direction of traffic which resulted in blocked emergency lanes, drivers blindly using the wrong lane staging on the side of the road and other dangerous and unmanaged traffic issues."

143.    The event also places a significant burden on local resources due to a lack of enforcement of dangerous and/or illegal activity that regularly takes place during these events. For example, upon information and belief, in the absence of sufficient enforcement, illegal drinking and fireworks are a regular occurrence at the UTV Takeover.

144.    Last year alone, ten crashes, five DUIs and one search and rescue were reported, and a gas tank was brought into the Oregon Dunes without prior approval. This presents significant risks to public health and safety by increasing fire risks at the Oregon Dunes NRA, and placing a burden on local resources to respond to illegal activity and medical emergencies at the event.

145.    While special use permits for OHV events may fall under the categorical exclusion for "short-term (one year or less) special uses of National Forest System lands," 36 C.F.R. § 220.6(d)(8), the exclusion does not apply to permits issued for DuneFest or the UTV Takeover because, on upon information and belief, the Forest Service has not engaged the requisite scoping required by 36 C.F.R. § 220.4(e)(1), and because "extraordinary circumstances" exist that would preclude the application of the categorical exclusion.

COMPLAINT – 42

146.    "When an agency decides to proceed with an action in the absence of an EA or EIS, the agency must adequately explain its decision." *Alaska Ctr. for the Env't v. United States Forest Serv*., 189 F.3d 851, 859 (9th Cir. 1999). To that end, the Forest Service is required to conduct scoping to determine whether issuance permits for the UTV Takeover and DuneFest may have a significant effect on the environment, including whether a cause-effect relationship exists between issuance of the permit and the resource conditions: the listed snowy plover and coastal marten, and the Oregon Dunes. *Riverhawks v. Zepeda*, 228 F. Supp. 2d 1173, 1191 (D. Or. 2002).

147.    Because the Forest Service failed to conduct the scoping and consider the significant impacts to resource conditions resulting from the agency's issuance of special use permits for DuneFest and the UTV Takeover – which could result in critical harm to federally listed species – it is precluded from relying on any categorical exclusion. As explained in greater detail above, the UTV Takeover and DuneFest present significant threats to federally listed coastal martens and their habitat by bringing OHVs in and near marten habitat and exposes them to impacts from noise, habitat destruction and potential vehicle strikes. Additionally, as the Forest Service acknowledged in the Biological Opinion on the 10(C) Designated Routes Project, OHV activity also may affect federally listed western snowy plovers. Further, impacts to these species occur in a congressionally designated national recreation area. 36 C.F.R. § 220.6(b)(1)(i), (iii).

148.    Rampant OHV activity from these events, among other things cause significant erosion of the landscape and destruction to vegetation, causes significant noise disturbance – harming both wildlife and local residents – and pose safety risks that impede other legitimate recreational uses of the Oregon Dunes, such as hiking and wildlife watching.

149.    Accordingly, the UTV Takeover Permit constitutes a major federal action that significantly impacts the human environment, and because the Forest Service may not rely on any categorical exclusion, the agency should analyze in an EA the impacts to coastal marten and western snowy plover from the permitted actions.

150.    The Forest Service's failure to prepare any analysis (EIS or EA) related to the issuance of special use permits for the UTV Takeover is therefore "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or constitutes "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §§ 706(2)(A), 706(1).

### FOURTH CLAIM FOR RELIEF

### Violations of NFMA, Forest Plans, and the APA

151.    Plaintiff hereby incorporates by reference the allegations presented in all preceding paragraphs.

152.    Pursuant to NFMA, all site-specific actions taken within a National Forest, including resource plans and permits must be consistent with applicable forest plans. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.15. The Forest Service's decisions must comply with both the Siuslaw Forest Plan and the Oregon Dunes Plan, including all standards and guidelines associated with those plans.

153.    Defendants violated NFMA because its previous and upcoming special use permits for DuneFest and the UTV Takeover fail to comply with governing Forest Plans.

154.    Among many other requirements, both the Siuslaw Forest Plan and Oregon Dunes Plan set forth forest-wide standards aimed at protecting endangered, threatened and sensitive species.

COMPLAINT – 44

155.      FW-07 requires that the Forest Service "[r]estrict or prohibit specific types of motor vehicles off roads in areas not already restricted if needed to protect resources, provide for public safety, or minimize conflicts among users." Siuslaw Forest Plan, *supra* note 2, at Ch. IV-40; Oregon Dunes Plan, *supra* note 1, at Ch. III-53. As explained above, special use permits for the UTV Takeover and DuneFest authorize harmful, disruptive motor vehicle activity such as night rides and treasure hunts for each event in and near coastal marten habitat and corridors. In issuing special use permits for DuneFest and the UTV Takeover, the Forest Service has repeatedly failed to restrict OHV use to protect marten habitat surrounding Horsfall Lake and west of Clear Lake and Lake Edna. Accordingly, the Forest Service's must restrict OHV activity in and near coastal marten habitat during these events to comply FW-07 and protect natural resources, including federally listed coastal martens and their habitat though measures such as area closures, fencing or relocation of event activities.

156.      FW-038 requires that the Forest Service prepare a biological evaluation where threatened and endangered species are present, Siuslaw Forest Plan, *supra* note 2, at Ch. IV-44; Oregon Dunes Plan, *supra* note 1, at Ch. III-58, which includes field surveys and "analysis of the effects of the proposed action on species or their occupied habitat or on any unoccupied habitat required for recovery." Forest Service Manual 2672.42. A biological evaluation is

> [a] documented Forest Service review of Forest Service actions in sufficient detail to: 1) comply with the requirements of the Endangered Species Act; 2) ensure that actions do not contribute to loss of viability of native or desired non-native plant or animal species, or cause a trend towards listing under the ESA; and 3) provide a standard by which to ensure that endangered, threatened, proposed, and sensitive species and critical habitats receive full consideration in Forest Service decision-making.

Forest Service Manual 2670.5.

COMPLAINT – 45

157.    Upon information and belief, the Forest Service has not prepared any biological evaluation containing field surveys analyzing impacts of permitted OHV events on listed coastal martens where these activities are set to occur. Such evaluations provide the agency critical information on impacts to federally listed species from the Forest Service's actions. Here, such actions include authorization of treasure hunts, concentrated sand camping and night rides during DuneFest and upcoming UTV Takeover events. Because the Forest Service failed to perform the necessary biological evaluation related to the issuance of special use permits for these events, it is not able to provide standards by which to ensure that federally listed coastal martens "receive full consideration" in its decision-making on these permits, such as how to best mitigate impacts to coastal martens from the event through, *inter alia*, changing the dates and times of events, implementing area closures or use of physical barriers to keep OHVs out of marten habitat. This is particularly important because the June UTV Takeover takes place during marten breeding season and while marten kits are still dependent on their mothers.

158.    FW-70 provides that activities and projects be managed in a manner that ensures they do not "reduce suitability of habitat needed to maintain the viability of species" by determining acceptable levels of effects on habitat and assuring that these levels are not exceeded via measures such as "support of research, intensive evaluation of habitat conditions, and temporary or intermittent restrictions on public use." Siuslaw Forest Plan, *supra* note 2, at Ch. IV-47; Oregon Dunes Plan, *supra* note 1, at Ch. III-61. In issuing special use permits for DuneFest and UTV Takeover, the Forest Service has repeatedly failed to restrict OHV use to protect marten habitat. The agency also failed to conduct any environmental evaluation – including under the ESA or NEPA – analyzing the impacts of OHVs on coastal martens and their habitat in the Oregon Dunes despite the significant ground disturbance and potential habitat

destruction caused by OHVs, consult with FWS on impacts to martens from the UTV Takeover (or any OHV event), or identify protections or mitigation measures to protect martens from OHV impacts during permitted events, some of which take place during marten breeding season and while marten kits are still dependent on their mothers. Considering the absence of environmental analysis on OHV impacts to martens and marten habitat in the Oregon Dunes and lack of safeguards to protect martens from OHVs during DuneFest and the UTV Takeover, the Forest Service – via issuance of the special use permits and management of these events – has failed to ensure that OHV use does not reduce the extent of suitable marten habitat below what is necessary to maintain the viability of the species. Accordingly, the agency must engage in environmental analysis related to the impacts of OHV activity on federally listed coastal martens and their habitat and restrict public use – including OHV use – in areas necessary to protect martens, such as through the use of fencing or road closures to protect marten habitat and corridors.

159.    The Oregon Dunes Plan sets forth additional requirements for the management of MA 10(B) areas. One such standard (B-9) requires the use of signs and barriers where necessary to protect special habitats within and adjacent to areas managed to allow open riding. Oregon Dunes Plan, *supra* note 1, at Ch. III-35.  Upon information and belief, the Forest Service has failed to install signs, fencing or physical barriers in order to protect martens and their habitat in and adjacent to areas managed to allow open riding, including during DuneFest and the UTV Takeover. If placed strategically to protect marten habitat and corridors, these protective measures would prevent OHV riders from riding on or through marten habitat and corridors adjacent to areas managed as MA 10(B) areas, where the treasure hunt and night rides occur.

160.    For the reasons set forth above, the Forest Service is in violation of NFMA for failing to ensure its issuance of special use permits for large OHV events comply with the Siuslaw Forest Plan and Oregon Dunes Plan, and its actions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under the APA. 5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

**Plaintiff respectfully requests that this Court:**

1.    Declare that Defendants have violated and are violating Section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), and its implementing regulations, 50 C.F.R. Part 402, by failing to reinitiate and complete reinitiated consultation on the 10(C) Project, failing to initiate and complete consultation on special use permits for upcoming OHV events in the Oregon Dunes, including 2024 UTV Takeover events in Coos Bay and Winchester Bay, and the upcoming 2024 DuneFest, and failing to ensure these activities are not likely to jeopardize the continued existence of coastal martens;

2.    Declare that Defendants have violated and are violating Section 7(d) of the ESA, 16 U.S.C. § 1536(d), and its implementing regulations, 50 C.F.R. § 402.09, by issuing new special use permits for large OHV events in the Oregon Dunes that harm listed coastal martens and their critical habitat, prior to completing required consultation with FWS, constituting an irretrievable commitment of resources in a manner that forecloses the formulation or implementation of reasonable and prudent measures or reasonable and prudent alternatives to protect the listed species and its designated critical habitat;

3.    Declare that Defendants have violated and are violating NEPA, 42 U.S.C. §§ 4321 *et seq*., and implementing CEQ regulations, 40 C.F.R. §§ 1500.1 *et seq*., by failing to properly

analyze the indirect, direct and cumulative effects of special use permits for the UTV Takeover and DuneFest on federally listed coastal martens;

4.   Declare that Defendants have violated and are violating NFMA, 16 U.S.C. §§ 1600 *et seq.* by failing to ensure its issuance of special use permits for large OHV events like DuneFest and the UTV Takeover complies with governing land management plans;

5.   Vacate Defendants' special use permits or other authorizations of activities in the Oregon Dunes that are contrary to law, as set forth above;

6.   Order Defendants to complete reinitiated consultation on the 10(C) Designated Routes Project in an expeditious fashion, and initiate and complete consultation prior to issuing special use permits for the upcoming UTV Takeover events and DuneFest;

7.   Order Defendants to conduct the proper NEPA analysis prior to issuing special use permits for the upcoming UTV Takeover events and DuneFest;

8.   Order all appropriate injunctive relief to protect federally listed coastal martens from OHV activity in the Oregon Dunes that is contrary to law, as set forth above;

9.   Award Plaintiff its costs and attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(d), the Endangered Species Act, 16 U.S.C. § 1540(g)(4), and other applicable provisions; and

10. Grant Plaintiff such other and further relief as the Court deems just and equitable.

RESPECTFULLY SUBMITTED this 11th day of June, 2024.

Sincerely,

*/s/ Tala DiBenedetto*
Tala DiBenedetto (NY Bar No. 5836994)*
CENTER FOR BIOLOGICAL DIVERSITY

COMPLAINT – 49

P.O. Box 371
Oceanside, NY 11572-0371
(718) 874-6734, ext. 555
tdibenedetto@biologicaldiversity.org

Attorney for Center for Biological Diversity

*/s/ Collette L. Adkins*
Collette L. Adkins (MN Bar No. 035059X)*
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 595
Circle Pines, MN 55014-0595
(651) 955-3821
cadkins@biologicaldiversity.org
Attorney for Center for Biological Diversity

*/s/ Chelsea Stewart-Fusek*
Chelsea Stewart-Fusek, OSB # 224994
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211
(971) 717-6425
cstewartfusek@biologicaldiversity.org
Attorney for Center for Biological Diversity

*Seeking admission *pro hac vice*