IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

CENTER FOR BIOLOGICAL DIVERSITY,

        Plaintiff,

      v.

U.S. FOREST SERVICE; BROOKE
ROLLINS, in her official capacity;
REBECCA BROOKE, in her official
capacity,

        Defendants,

DOUGLAS COUNTY, OREGON;
COOS COUNTY, OREGON;
SAVE THE RIDERS DUNES, INC.,

        Intervenor Defendants.

**OPINION & ORDER**

Civ. No. 6:24-cv-00930-AA

_____

AIKEN, District Judge:

Before the Court are cross-motions for summary judgment filed by Plaintiff Center for Biological Diversity ("Plaintiff" or "the Center"), ECF No. 98; by Defendants U.S. Forest Service, Brooke Rollins, and Rebecca Brooke (collectively, "USFS" or "Forest Service"), ECF No. 99; and by Intervenors Douglas County, Oregon; Coos County, Oregon; and Save the Riders Dunes, Inc. (collectively, "Intervenor-Defendants"), ECF No. 102, as to Plaintiff's claims against Forest Service for alleged violations of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531 *et seq.*; National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*;

Page 1 – OPINION AND ORDER

National Forest Management Act ("NFMA"), 16 U.S.C. §§ 1600 *et seq.*; and Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*  For the reasons explained below, Plaintiff's Motion, ECF No. 98, is GRANTED; Forest Service's Motion, ECF No. 99, is DENIED; and Intervenor-Defendant's Motion, ECF No. 102, is DENIED.

## FACTUAL BACKGROUND

On June 11, 2024, Plaintiff sued the Forest Service for expanding off-highway vehicle ("OHV") activity and for issuing special use permits ("SUPs") for multi-day large-scale commercial OHV events on the Oregon Dunes in threatened coastal marten designated critical habitat in violation of applicable environmental law. Compl., ECF No. 1.

I.      *The Coastal Marten's ESA Listing and Critical Habitat Designation*

In 2020, the U.S. Fish and Wildlife Service ("FWS") listed as "threatened" under the ESA the distinct population segment ("DPS") of the Pacific or coastal marten.  AR07966 (Listing Rule); 85 Fed. Reg. 63806, 63807 (Oct. 8, 2020) (same). On May 29, 2024, FWS designated approximately 1.2 million acres of critical habitat for the coastal marten, including 28,843 acres in the Oregon Dunes National Recreation Area (the "Dunes"), managed by the Siuslaw National Forest.  This designation covers nearly the entire Dunes.  AR09394, 406-07 (Critical Habitat); 89 Fed. Reg. 46576, 46588-89 (May 29, 2024) (same).

The coastal marten, *Martes caurina*, a small cat-size mammal in the *Mustelidae* or mustelid family, is native to the coastal forests of Oregon and northern

Page 2 – OPINION AND ORDER

California.    AR07109, AR07171 (2019 Status Assessment); AR07116 (same) (describing the coastal marten as having brown fur, triangular ears, bushy tail); AR07969 (Listing Rule).   Unlike martens found elsewhere in the world, coastal martens live only in Oregon and Northern California. *Id.*

In 2020, scientists estimated the coastal marten population on the Oregon Dunes at 71 individuals across two subpopulations—42 martens north of the Umpqua River and 29 martens south of it.  AR07631 (Restoration Project Consultation).  The Oregon Dunes DPS is "vulnerable to extirpation" because of its small size and isolation from other populations.  AR07345 (Restoration Project EA).  A "population viability analysis" concluded that even two or three annual human-caused mortalities would strongly increase the extinction risk for the Oregon Dunes marten subpopulations.  AR06772 (Linnell et al., 2018).  As such, "[a]ny increase in human-caused mortality is expected to negatively impact the [Oregon Dunes] population." AR07345 (Restoration Project EA).

In 2020, FWS determined that the primary "threats" to the Oregon coastal marten DPS are posed by habitat loss and degradation (including loss of habitat connectivity), by human disturbance, and by vehicle strikes on Highway 101, which runs the length of the Oregon Dunes' long eastern border.  AR08001 (Listing Rule); AR08053 (Recovery Outline).  FWS determined that "existing regulatory mechanisms and current conservation efforts" to prevent habitat loss and fragmentation were insufficient to mitigate the risk of extirpation.  AR08001 (Listing Rule).

Page 3 – OPINION AND ORDER

II.    *The Dunes*

In 1972, Congress established the Oregon Dunes National Recreation Area to provide for the "conservation of scenic, scientific, historic, and other values" and "public outdoor recreation."  16 U.S.C. § 460z.  The Dunes consists of about 28,900 acres of sand dunes and coastal forest managed by the Forest Service as part of the Siuslaw National Forest.  AR06714 (Routes Project Record of Decision ("ROD")).

A 1994 Oregon Dunes Management Plan ("Dunes Plan") and the 1990 Forest Plan for the Siuslaw National Forest ("Forest Plan") govern the Forest Service's management of the Oregon Dunes.  AR02608-923 (Forest Plan); AR03660-813 (Dunes Plan).  The Plans include directives to conserve listed species and critical habitat and to regulate OHV use.  The Dunes Plan, for example, provides OHV noise limits that operate across the Dunes and prohibits OHV use where the critical nesting habitat of the ESA-listed threatened snowy plover could be harmed.  AR03713 (Dunes Plan).

III.    *The Challenged Actions*

Plaintiff brings claims against the Forest Service for two different but related agency actions: (1) the 2015 Routes Project, which expanded OHV use on the Dunes; and (2) the ongoing issuance of SUPs for large commercial OHV events on the Dunes.  Both actions occur on or adjacent to designated marten critical habitat.

A.    *The Routes Project*

The Routes Project was implemented in 2015, before the marten's listing and critical habitat designation.  The Routes Project expanded OHV riding areas on the Dunes in two Management Areas: 10(B), an unrestricted or open riding area, and 10(C), a designated trail riding area. Specifically, the Routes Project opened up 518

Page 4 – OPINION AND ORDER

acres of trail riding to open riding, re-designating that area, formerly Management Area 10(C), as 10(B). AR06718 (Routes Project ROD). And the Project created an additional 2.3 miles of trails in 10(C). *Id.* The conversion of 518 acres from trail riding to open riding removed vegetation protection from 518 acres, subjecting those areas to unrestricted open riding and vegetation destruction.0F[1] AR09468 (June 2024 ESA 7(d) Determination).

In 2015, the Routes Project underwent both a NEPA environmental review and an ESA consultation with FWS due to the presence of the threatened snowy plover. AR05493–669 (Routes Project FEIS); AR06290–341 (Routes Project Biological Opinion ("BiOp")). The resulting BiOp imposed mandatory monitoring, reporting, and mitigation requirements to minimize OHV impacts on the snowy plover. AR06330–33 (Routes Project BiOp). The BiOp also provides that ESA consultation be reinitiated if "a new species is listed or critical habitat designated that may be affected by the action." AR06334 (Routes Project BiOp); *see also* 50 C.F.R. § 402.16(a)(3) (requiring that ESA consultation be reinitiated where a later proposed action "causes an effect to the listed species or critical habitat that was not considered in the biological opinion").

---

[1] The goal of Management Area 10(B), which comprises 22% of Dunes land area, to "provide relatively unrestricted opportunities for off road vehicle riding in areas that are predominantly sand." AR09491 (June 2024 ESA 7(d) Determination). The goal of Management Area 10(C), which comprises 14% of Dunes land area, to "minimize [OHV] impacts in vegetated areas while allowing controlled opportunities for riding and travel through the area on designated routes for access to the beach and other areas[.]" *Id.* (concluding that the effective removal of vegetation protection from 518 acres "would not constitute an irreversible or irretrievable commitment of resources").

In 2020, the Forest Service undertook ESA consultation for the snowy plover for a different Dunes project, the "Restoration Project," a Dunes vegetation management project. The maps produced from that consultation show that the 2015 expansion of OHV riding areas overlap coastal marten habitat. *See* AR06738–40 (Routes Project ROD maps, with newly designated open riding areas in purple); AR07325–31 (Restoration Project Maps, with affected marten habitat areas shown in purple).

In 2020, after the coastal marten was listed, the Forest Service failed to reinitiate ESA consultation to determine the effects on the marten from the Project's newly expanded riding areas. Nor did the Forest Service reinitiate consultation after the marten's critical habitat was designated in 2024.

B.    *Ongoing Special Use Permitting of Commercial OHV Events*

For over a decade, the Forest Service has issued SUPs for multi-day commercial OHV events (such as "DuneFest" and "UTV Takeover")[2] on the Dunes— events with thousands of attendees and hundreds of riders, vendors, and sponsors. *See*, *e.g.*, AR04726–30 (2011 Decision Memo for DuneFest permit that occurred in the Middle Riding area, Winchester Bay/Umpqua Dunes); AR09541–601 (2024 Coos Bay UTV Takeover SUP). The SUPs authorize special riding activities such as racing

---

[2] UTV means utility terrain vehicle. SuppAR507 (Nationwide Ins. 2024). Unlike ATVs, which have a single straddle seat and handlebars, UTVs have side by side seating, a steering wheel, and foot pedals. SuppAR505–07 (same). Unlike ATVs, UTVs "are built and used more for work than recreation." SuppAR507 (same). "They are large, powerful, able to seat passengers side by side, and built with lots of storage space." *Id.* "UTVs handle[] more like a car[,] . . . are faster and more powerful than ATVs, but not as nimble" and have "max speed . . . between 25 mph and 50 mph." *Id.*

competitions, multi-day "treasure hunts" "with less than 75 people," AR09571, day and night group rides of 50–100 OHVs, *id.*, and concentrated camping PODS to accommodate about 3,200 people and 800 trailers, AR09567 (*id.*).

The permitted multi-day commercial OHV events occur on or adjacent to coastal marten critical habitat and large corridors and direct riders to and provide access to sensitive areas. For example, the 2024 UTV Takeover, which is located in the South Riding Area, conducted its "Day Ride" and "Treasure Hunt" on or adjacent to marten habitat and corridors. *See* AR09580–81 (2024 UTV Takeover SUP) (map of Day Ride route); AR09586–87 (same) (map of Treasure Hunt route); AR07330–31 (Restoration Project EA) (map of South Riding area, with marten habitat in purple and corridors in yellow). Further, the permitted events take place in June (Coos Bay UTV Takeover) and in August (DuneFest and Winchester Bay UTV Takeover), a critical period when martens give birth and raise their young. AR07118–19 (2019 Status Assessment); SuppAR 160–68 (Delheimer et al., 2021).

The Forest Service has failed to initiate consultation on any of the SUPs, including the 2024 and 2025 SUPs. Nor has the Forest Service ever prepared an environmental assessment ("EA") or environmental impact statement ("EIS") for any of the SUPs, including the 2024 and 2025 SUPs. In March 2024, ahead of the June 2024 Coos Bay UTV Takeover, the Forest Service commenced documentation to categorically exclude the permitting of that event from environmental review. AR9256–69 (Categorical Exclusion ("CE")). In March 2024, the Forest Service issued an ESA Section 7(d) determination, which concluded that issuing a permit for the

June 2024 commercial OHV event would not constitute an "irreversible or irretrievable commitment of [agency] resources." AR09465–92 (June 2024 7(d) Determination); 16 U.S.C. § 1536(d) (prohibiting an agency that has initiated consultation from irreversibly or irretrievably committing agency resources to the proposed action). And in June 2024, the Forest Service prepared a biological evaluation ("BE") that determined that the June 2024 event would have "no effect" on the marten or its habitat. AR09443–47 (Biological Evaluation for Categorical Exclusion ("BE for CE")).

## LEGAL BACKGROUND

I.    *The Endangered Species Act*

The ESA mandates that "all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of [the ESA]." 16 U.S.C. § 1531(c)(1). Accordingly, each federal agency must consult with, in this case, US Fish and Wildlife Service ("FWS") to "insure" that the agency's actions are "not likely to jeopardize the continued existence of any [listed species] or result in the destruction or adverse modification of habitat of such species" and to identify ways to modify the agency's actions to avoid or reduce harms. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14. If a listed species "may be present" where a proposed action would occur, the agency must prepare "at the earliest possible time" a biological assessment ("BA") to determine whether the action "may affect" the listed species. 16 U.S.C. § 1536(c)(1); 50 C.F.R. §§ 402.12, 402.14(a). The agency must use "the best scientific and commercial data

available" to determine whether the action "may affect" the listed species or its habitat. 16 U.S.C. § 1536(a)(2). Once consultation is initiated or reinitiated, the agency "shall not make any irreversible or irretrievable commitment of resources . . . which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures." 16 U.S.C. § 1536(d). "This prohibition is in force during the consultation process and continues until the requirements of Section 7(a)(2) are satisfied." 50 C.F.R. § 402.09.

II.    *National Environmental Policy Act*

The National Environmental Policy Act ("NEPA") is a "procedural cross-check" designed to "inform agency decisionmaking." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*, 605 U.S. 168, 173 (2025). NEPA requires federal agencies to publicly disclose the environmental impacts of a proposed action and prepare an environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). If an agency is unsure whether its proposed action will have significant environmental impacts, it may first prepare an environmental assessment ("EA"). *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 872 (9th Cir. 2022). "An EA is a concise, public document providing sufficient evidence and analysis for the agency to determine whether to prepare an environmental impact statement." *Id.* (internal citation and quotation marks omitted). "If the agency concludes in the EA that there is no significant effect from the proposed project, the federal agency may issue a finding of no significant impact ("FONSI") in lieu of preparing an EIS." *Native Ecosystems*

Page 9 – OPINION AND ORDER

*Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005). However, where a proposed action falls in a category of minor actions that "normally does not significantly affect" the environment, a categorical exclusion may apply and the agency need not prepare an EA or EIS. 42 U.S.C. § 4336e(1) (defining "categorical exclusion"); 36 C.F.R. § 220.6(a), (b)(1) (2020); 7 C.F.R. § 1b.3 (2025). Categorical exclusions apply only where the proposed action is "within a category" and involves no "extraordinary circumstances." *Id.*

III.    *National Forest Management Act*

NFMA and its implementing regulations "provide for forest planning and management by the Forest Service on two levels: (1) forest level and (2) individual project level." *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir. 2012). NFMA requires that the Forest Service prepare a land and resource management plan, or "forest plan," for each national forest that includes standards and guidelines that govern its management. 16 U.S.C. § 1604(a), (c), (g)(2)–(3). Every permit and project must be consistent with the plan. *Id.* § 1604(i); 36 C.F.R. § 219.15(b), (d). It is "well-settled that the Forest Service's failure to comply with the provisions of a Forest Plan is a violation of NFMA." *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 961 (9th Cir. 2005).

**LEGAL STANDARD**

Claims brought under the ESA, including those brought under the ESA's citizen suit provision, and claims brought under NEPA and NFMA are reviewed under the APA. *See Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 581 F.3d

1063, 1070 (9th Cir. 2009); *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 481 (9th Cir. 2011) (explaining that ESA citizen suits are reviewed under the APA).  The APA limits the scope of judicial review to the administrative record. 5 U.S.C. § 706 (directing the court to "review the whole record or those parts of it cited by a party").  Because the Court's review is limited to the administrative record, no facts are in dispute.  *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985).   Therefore, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *Id.*  "Summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did."  *Id.* at 770.

Under the APA, courts must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A).  Under this standard, an "agency must examine the relevant data and articulate a satisfactory explanation for its action."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  "An agency's action is arbitrary and capricious if the agency fails to consider an important aspect of a problem, if the agency offers an explanation for the decision that is contrary to the evidence, if the agency's decision is so implausible that it could not be ascribed to a difference in view or be the product of agency expertise."  *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005) (citing *State Farm*, 463 U.S. at 43).

## DISCUSSION

Plaintiff brings two ESA claims, one NEPA claim, and one NFMA claim against the Forest Service for failing to comply with applicable law as to (1) its Routes Project, which expanded OHV use in the Dunes, and as to (2) its prior and ongoing issuance of special use permits for commercial OHV events in the Dunes. Plaintiff requests injunctive and declaratory relief including interim measures "to mitigate ongoing harm." Pl. Mot. at 36–38.

I.    *The Court has subject matter jurisdiction.*

As a threshold matter, the Forest Service moves for summary judgment for lack of subject matter jurisdiction on the claims that involve the Forest Service's issuance of SUPs for commercial OHV events on the Dunes. USFS Mot. at 11. The Forest Service contends that the permitting claims are moot because they "are based on special use permits issued in 2024 and 2025 that are no longer in effect." USFS Mot. at 11. The Forest Service also contends that "to the extent Plaintiff wishes to challenge future permits, its claims are unripe[]" because any such claims do not (yet) constitute agency actions. *Id.*

Plaintiff "does not dispute that the SUPs [at issue] have now expired." Pl. Resp. at 12. Plaintiff maintains that those claims are not moot because (1) the Court can still provide effective relief in the form of injunctive or declaratory relief and interim mitigating measures; Pl. Mot. at 36–38; and (2) the challenged action is capable of repetition yet evades review and thus falls in the mootness exception, Pl. Resp. at 13–14.

Page 12 – OPINION AND ORDER

"Article III of the Constitution restricts the power of federal courts to 'Cases' and 'Controversies.'" *Chafin v. Chafin*, 568 U.S. 165, 171 (2013). "There is . . . no case or controversy, and a suit becomes moot, when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Id.* at 172 (internal citation and quotation marks omitted). So, "a case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party[.]" *Id.* (internal citation omitted). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id.*

A request for injunctive relief is not mooted "where the violation complained of may have caused continuing harm and where the court can still act to remedy such harm by limiting its future adverse effects[.]" *Nw. Env't Def. Ctr. v. United States Army Corps of Eng'rs*, 479 F. Supp. 3d 1003, 1025 (D. Or. 2020); *see also Nw. Env't Def. Ctr. v. Gordon*, 849 F.2d 1241, 1245 (9th Cir. 1988) (holding that the plaintiffs claim was not mooted because "the damage can still be repaired or mitigated"); *Bayer v. Neiman Marcus Grp., Inc.*, 861 F.3d 853, 864 (9th Cir. 2017) ("A request for injunctive relief remains live only so long as there is some present harm left to enjoin."). Further, "declaratory judgment [can] help to remedy the effects of [an] agency's statutory violations and to ensure that similar violations w[ill] not occur in the future[.]" *Forest Guardians v. Johanns*, 450 F.3d 455, 462 (9th Cir. 2006).

"The party asserting mootness bears the burden of establishing that there is no effective relief that the court can provide." *Id.* at 461. Government defendants asserting mootness must meet that "formidable burden" just like any private

Page 13 – OPINION AND ORDER

defendant must. *Fed. Bureau of Investigation v. Fikre,* 601 U.S. 234, 241 (2024). Here, the Court can still provide Plaintiff relief even though the 2024 and 2025 permits are expired. The Court can grant both injunctive relief, including interim relief to mitigate harm to the species and habitat, and declaratory relief.

Further, where a defendant voluntarily ceases the challenged conduct during litigation, the action may fall within the capable-of-repetition-but-evading-review mootness exception. "Government actions fall within this category if (1) the duration of the challenged action is too short to allow full litigation before it ceases, and (2) there is a reasonable expectation that the plaintiffs will be subjected to it again." *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1329 (9th Cir. 1992); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 189 (2000) ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.").

Here, the challenged conduct falls within the mootness exception. First, the duration of each of the challenged permits is too short to allow full litigation. Plaintiff contends that the Forest Service issues permits for the commercial OHV events "just weeks before the large riding events occur" and each of the permitted events lasts less than a week. Pl. Resp. at 13. "[The Ninth Circuit] ha[s] repeatedly held that similar actions lasting only one or two years evade review." *Karuk Tribe of California v. U.S. Forest Serv.,* 681 F.3d 1006, 1018 (9th Cir. 2012).

Second, Defendant has not shown that the challenged conduct cannot "reasonably be expected to recur." *Fikre,* 601 U.S. at 240. Plaintiff contends that

"[f]or over a decade, the Forest Service has issued [SUPs] to commercial riding event organizers so they can use the Oregon Dunes." Pl. Mot. at 7; Pl. Resp. at 13–14. *See, e.g.*, AR04726-29 (2011 Decision Memo for DuneFest permit). Plaintiff maintains that the Forest Service has never consulted with FWS or prepared an EA under NEPA to analyze the SUPs' impacts on the coastal marten or its habitat. Pl. Resp. at 14. And the Forest Service continues to issue such permits during this litigation. *See, e.g.*, Pl. Mot. for Prelim. Inj., ECF No. 47.

In response, the Forest Service suggests that it is not certain to issue future SUPs for commercial OHV events on the Dunes. USFS Reply at 3, ECF No. 107. Forest Service states that in 2025, for example, the organizer of the Winchester Bay UTV Takeover "withdrew its permit application and went forward with the event." *Id.* The Court takes judicial notice that the organizer was required to obtain a permit for its 2025 commercial OHV event, Winchester Bay UTV Takeover, in which the organizer held out to the public information from which a reasonable person could conclude that riding on the Dunes was available in connection with the event.[3] That "event went forward" in violation of federal law with the Forest Service's knowledge. The Forest Service contends that "Plaintiff cannot assume that a sponsor will apply for a permit and [that] the Forest Service will issue a permit or that a future permit will suffer from the same alleged defects[.]" USFS Resp. at 12, n.5, ECF No. 105.

---

[3] Commercial activities cannot be conducted on forest service land without an SUP. *See* 36 C.F.R. §§ 251.50, 251.51. And noncommercial activities with 75 or more people also generally cannot be conducted on forest service land without an SUP. *See* 36 C.F.R. § 251.50. To determine whether an activity falls in one of these categories, courts look to the substance of the activity, not the form.

Page 15 – OPINION AND ORDER

To fall within the mootness exception, certainty of recurrence is not required. There need only be "reasonable expectation" that the challenged conduct will recur. Further, the recurring conduct need only be "materially similar" to prior wrongful conduct; it need not be identical. *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 463 (2007); *see also Alaska Ctr. for the Env't v. U.S. Forest Serv.,* 189 F.3d 851, 856–57 (9th Cir. 1999) (applying mootness exception where the Forest Service had issued prior annual permits without sufficient NEPA review—even though prior permits issued to different applicants).

Given that permits are required to conduct commercial OHV events and large non-commercial OHV events on the Dunes and given the Forest Service's history of issuing such permits without consultation or adequate environmental review, the Forest Service's suggestion that future SUPS may not "suffer from the same alleged defects" is not sufficient to defeat the reasonable expectation that the conduct is likely to recur.

In sum, Plaintiff's claims are not moot because the Forest Service has not met the heavy burden to show that the Court can provide no effective relief.  Further, the SUP claims fall under the capable-of-repetition-but-evading-review mootness exception because the permitted activities are too short in duration to complete litigation and the Forest Service has not shown that the challenged conduct cannot reasonably be expected to recur.  Accordingly, Plaintiff's claims as to the 2024 and 2025 SUPs are not moot.

II.    *ESA Claims*

Page 16 – OPINION AND ORDER

Plaintiff brings two ESA claims against the Forest Service. Plaintiff contends that the Forest Service violates ESA's consultation requirement, Section 7(a)(2), by failing to reinitiate and complete consultation as to the Routes Project, which expanded OHV activity on the Dunes on or adjacent to critical habitat. Pl. Mot. at 16. And Plaintiff contends that the Forest Service violates ESA's consultation requirement by failing to initiate and complete consultation as to the issuance of SUPs for commercial OHV events on the Dunes which take place on or adjacent to critical habitat. *Id.* at 20.

    A.    *The Forest Service violates the ESA by failing to reinitiate and complete consultation on the Routes Project.*

Plaintiff contends that the Forest Service violates ESA Section 7(a)(2) by failing to reinitiate FWS consultation on its Routes Project as to the coastal marten. The 2015 Routes Project opened up 518 acres to unrestricted OHV riding by re-designating those areas from Management Area 10(C) (designated trail riding) to Management Area 10(B) (unrestricted or open riding). AR06718 (Routes Project ROD). The Project also created an additional 2.3 miles of OHV trails in the designated trail area, 10(C). *Id.* At that time, the Project underwent ESA consultation for the ESA-listed threatened snowy plover. *See* AR06290-341 (Routes Project BiOp). And, in 2014, the Project underwent NEPA review, which produced an EIS. *See* AR05493–669 (Routes Project FEIS). Five years later, in 2020, the coastal marten was listed as a threatened species and, in 2024, its critical habitat was designated. The Forest Service did not reinitiate consultation as to the marten.

The ESA requires that Federal agencies reinitiate consultation "where discretionary Federal involvement or control over the action has been retained or is authorized by law and . . . a new species is listed or critical habitat designated that *may be affected* by the identified action."  50 C.F.R. § 402.16(a)(4) (emphasis added).

> 1.    *The Forest Service has discretionary control over the Routes Project.*

The ESA implementing regulations provide that Section 7 applies only to actions "in which there is discretionary Federal involvement or control." 50 C.F.R. § 402.03.  There is no duty to consult for actions "that an agency is *required* by statute to undertake once certain specified triggering events have occurred."  *Karuk Tribe*, 681 F.3d at 1024 (emphasis in original).  And "the discretionary control retained by the federal agency also must have the capacity to inure to the benefit of a protected species."  *Id.*; *see also, e.g., Ground Zero Ctr. for Non-Violent Action v. U.S. Dep't of the Navy*, 383 F.3d 1082, 1092 (9th Cir. 2004) (no duty to consult where Navy lacked discretion to cease missile operations for the protection of listed species).

Intervenor-Defendants contend that ESA Section 7 does not apply here because the Forest Service lacks discretionary control over the Project.   Int. Mot. 15–16. Intervenor-Defendants maintain that the Forest Service is required by "governing land management [P]lans[,]" which "formalized existing motorized use and corrected longstanding mapping errors" to align "on-the-ground management" with the Plans. *Id.*  Intervenor-Defendants contend that the 2015 Routes Project ROD merely finalized the pre-existing planning decisions and "left the agency with no discretionary control." *Id.* at 16.

Page 18 – OPINION AND ORDER

The Forest Service has discretionary control over the Routes Project. First, the Project itself imposes on the Forest Service ongoing management responsibilities that inure to the benefit of the snowy plover, a different listed species affected by the Project. *See*, *e.g*, AR06330–33 (Routes Project BiOp) (requiring ongoing monitoring, reporting, enforcement, and public education as to snowy plover). And the governing Plans provide the Forest Service with discretionary authority to modify the Project to protect listed species and critical habitat. *See* AR03718, AR03783–92 (Dunes Plan) (authorizing Forest Service to close riding areas to "protect special habitats" and "to restrict[] [OHV riding] at night," and setting forth monitoring procedures for listed species and critical habitat on the Dunes). Further, the governing management Plans, consistent with the ESA, grant the Forest Service discretionary authority to protect listed species, FW-038, AR03742 (Dunes Plan), AR02693 (Forest Plan); protect critical habitat, FW-070, AR03745 (Dunes Plan), AR02694 (Forest Plan); "restrict or prohibit" OHV use to protect Dunes resources (such as habitat and listed species), AR03737 (Dunes Plan), AR02689 (Forest Plan); and protect habitat from OHV use in open riding areas, Dunes Plan B-9, AR03719 (Dunes Plan). Finally, the Forest Service's own regulations permit the agency to revise designated trails and areas authorized for motorized vehicle use "as needed to meet changing conditions." 36 C.F.R. § 212.54.

"An agency retains discretion and the duty to comply with Section 7(a)(2) of the ESA unless the enabling legislation for the agency's action is both *mandatory* and *inconsistent* with the agency's obligations under the ESA." *Yurok Tribe v. U.S.*

*Bureau of Reclamation*, 179 F.4th 663, 677 (9th Cir. 2026) (emphasis in original) (internal citation omitted).

Intervenor-Defendants point to no evidence that the enabling legislation for the Routes Project is mandatory and inconsistent with the Forest Service's obligation to comply with the ESA. Even where a statute compels a certain agency action, "the ESA still applies if the statute can be construed in harmony with the ESA's language." *Id.*; *see also Karuk Tribe*, 681 F.3d at 1024 ("An agency cannot escape its obligation to comply with the ESA merely because it is bound to comply with another statute that has consistent, complementary objectives. The competing statutory objective need only leave the agency some discretion." (internal citation omitted)). Here, Intervenor-Defendants point to the governing Plans, not to a statute. The Plans are consistent with ESA's consultation duty because they not only direct the agency to protect listed species and critical habitat, but they also direct the agency to "restrict or prohibit" OHV use to do so. For this reason, the Forest Service has discretionary control over the Routes Project.

2.    *The Routes Project may affect the coastal marten or its habitat.*

Plaintiff contends that the Project "may affect" the coastal marten or its habitat. Pl. Mot. at 17.

Under the ESA, consultation is required where a proposed action "may affect listed species or critical habitat" to ensure that the action is not "likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(a), *id.* § 402.16(a)(4) (where a

Page 20 – OPINION AND ORDER

species is newly listed or critical habitat newly designated, consultation must be reinitiated where the species or habitat "may be affected by the identified action").

The "may affect" threshold for triggering ESA consultation is "relatively low." *Karuk Tribe*, 681 F.3d at 1027. "*Any possible effect*, whether beneficial, benign, adverse or of an undetermined character, triggers the consultation requirement." *Id.* (emphasis in original) (internal citation and quotation marks omitted). Though a plaintiff bears the burden to show that the agency action "may affect" listed species or critical habitat, the burden is not a heavy one. *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1122 (9th Cir. 2012) (emphasis added). A plaintiff need show "only that an effect on listed species or critical habitat is plausible." *Id.*

The record shows that the Project's North, Middle, and South Riding areas expanded OHV use on or adjacent to designated coastal marten habitat. *See* AR06738–40 (2015 Routes Project ROD) (maps of the converted riding areas).

In the North Riding Area, the Project converted to open riding large areas that overlap critical habitat and corridors. AR06738 (Routes Project ROD) (North Riding Areas converted to open riding, shown in purple); AR7326 (2020 Restoration Project EA) (North Riding Area, with marten habitat shown in pink); *see also* AR09431 (Critical Habitat Unit 2 map) (showing same area). The Project converted nearly the entire martin habitat in this area to open riding, which subjects vegetated habitat areas to destruction from unrestricted OHV riding. And the Project designated new OHV routes that bisect forested areas. AR06738 (Routes Project ROD) (forested area

Page 21 – OPINION AND ORDER

shown in green, new routes indicated).  The vegetated and forested areas now at risk of destruction from OHV use provide physical and biological features essential to marten survival.  *See* AR09403 (Critical Habitat Designation) (describing forested areas with shrub understory as primary essential habitat features to provide martens with cover from predators, resting structures, and thermal and predator protection for kits and denning females and to provide foraging for marten prey); *see also* AR09244 (March 2024 NOI) (aerial photo of unrestricted OHV riding area showing vegetation obliteration and an adjacent area with intact vegetation that is closed to protect the snowy plover); *see also* AR09245-46 (same) (photos of forest and vegetation destruction adjacent to trails and open riding areas on the Dunes, showing OHV-caused severely eroded cutbanks and tree islands each with a single remaining tree encircled by OHV tracks in what used to be a vegetated area).  Scientists have documented a number of individual martens on this part of the Oregon Dunes. AR06745 (Moriarty et al., 2016); AR07177 (2019 Status Assessment).  However, in 2018, the marten population in the North Riding Area (north of the Umpqua River) was estimated at only about 30 adult individuals.  *Id.*

In the Middle Riding Area, known as the Umpqua Dunes, the Routes Project also converted to open riding areas that overlap critical habitat.  *See* AR06739 (Routes Project ROD) (Middle Riding Area converted to open riding, shown in purple and marten habitat shown in green).  Among the Middle Riding areas converted into open riding were "2 acres of native forest" on "Banshee Hill," AR06721 (Routes Project ROD), and a large area of vegetated habitat that the Project aims to turn into "open

sand[,]" AR06717–18 (*id.*); *see also* AR06739 (*id.*) (map of vegetated habitat to be converted into sand, shown in purple).  Unlike the North and South Riding areas, the Forest Service provides no curfew for the Umpqua Dunes and authorizes open riding 24 hours a day.  AR03689–90 (Dunes Plan).  Nearly the entire Umpqua Dunes is designated critical habitat for the coastal marten.  *See* AR09432 (map of critical habitat Unit 3 which overlaps Middle Riding Area in Douglas County).  Martens are known to live in the Umpqua Dunes area, which is south of the Umpqua River. AR06762 (Linnell et al., 2018).  In 2018, the marten population south of the Umpqua River was estimated at only about 30 adult individuals.  AR07177 (2019 Status Assessment).

In sum, the record shows that the Routes Project converted to open riding and created new trails in areas that are on or adjacent to coastal marten critical habitat and corridors.  For that reason, the Routes Project "may affect" the marten or its habitat.  The record, reviewed below, also provides evidence as to specific OHV effects on the coastal marten or its habitat—evidence of forest and vegetation destruction, noise and other human disturbance, and increased risk of vehicle strikes.  However, the fact that the Routes Project expanded OHV riding into new areas on or adjacent to critical habitat is sufficient to trigger the ESA's low consultation threshold.

          3.      *The Forest Service has not initiated or completed consultation.*

The Forest Service does not dispute that it is obligated to reinitiate consultation as to the Routes Project.  USFS Mot. at 13–16.  The Forest Service contends that it "has been engaged on consultation [with FWS] since January 2024"

Page 23 – OPINION AND ORDER

and "submitted a draft BA to FWS [in September 2025] and is now waiting for [FWS] to accept that BA, provide feedback, or request for more information." *Id.* at 13. The Forest Service contends that Plaintiff's ESA consultation claim as to the Routes Project is moot because "the relief Plaintiff request[s] has been fulfilled." *Id.* at 14.

The Forest Service has neither reinitiated consultation nor provided the relief that Plaintiff requests. The Forest Service has not reinitiated consultation because though it has prepared a draft BA, it has not completed that draft. Richardson Decl. ¶ 20, ECF No. 100. Consultation cannot be initiated "until any required biological assessment has been completed[.]" 50 C.F.R. § 402.14(c)(3); *see also* Zwartjes Decl. ¶ 10, ECF No. 101 ("to initiate consultation, FWS must determine whether the [biological assessment] submitted by the action agency fully and adequately describes all necessary information"); AR03943 (ESA Consultation Handbook) (same).

Further, until consultation is completed, Plaintiff cannot receive relief in the form of "reasonable and prudent measures" to "minimize" effects to the marten or its habitat, 16 U.S.C. § 1536(b)(4), or "discretionary conservation recommendations," 50 C.F.R. § 402.14(i), (j); *see also* AR03938–39 (ESA Consultation Handbook) (describing outcomes of the consultation process). Though Plaintiff requests interim injunctive relief pending the initiation and completion of consultation, Pl. Mot. at 37, Plaintiff cannot receive full relief from any substantive ESA violations until consultation is completed. *See Nw. Env't Def. Ctr. v. U.S. Army Corps of Eng'rs*, No. 3:18-cv-00437-HZ, 2019 WL 2372591, *8 (D. Or. June 5, 2019) (rejecting federal defendants' argument that reinitiation of consultation mooted plaintiff's ESA Section 7 claim

Page 24 – OPINION AND ORDER

because "there remain in this case parallel substantive violations of the ESA for which the Court could grant relief"); *see also Wash. Toxics Coal. v. EPA*, No. C01-132C, 2002 WL 34213031, at *19 (W.D. Wash. July 2, 2002) (holding that "mere pledge to comply with its proposed schedule" for consultation does not moot plaintiff's ESA Section 7 claim).

In sum, the Forest Service has not reinitiated consultation because it has sent a mere draft BA to FWS, and the Service has not confirmed that the document is complete and accurate. Further, Plaintiff cannot receive full relief until the consultation is completed and substantive protections, if available, are granted.

Finally, the Forest Service contends that it "is still within the time frame to complete consultation" because critical habitat was not designated until May 29, 2024, and "the Forest Service has five years from the coastal marten listing or its critical habitat designation, whichever is later, to consult on its land use plans." USFS Mot. at 16 (citing 16 U.S.C. § 1604(d); 50 C.F.R. § 402.16(b)).

The Forest Service is not within the timeframe to reinitiate consultation, and that consultation is long overdue. ESA regulations require that an agency review its actions "at the earliest possible time" to determine whether "any action . . . may affect listed species or critical habitat[.]" 50 C.F.R. § 402.14(a) (2019). The marten was listed in 2020 and the habitat was designated in 2024. The Forest Service was obligated to consult "at the earliest possible time" after the marten's listing in 2020. Yet the Forest Service waited more than five years after that listing to prepare a draft BA.

Page 25 – OPINION AND ORDER

The Forest Service contends that it has five years to consult after the habitat designation.  But the Forest Service conflates the ESA project-level consultation timeframe with the NFMA program-level consultation timeframe.  As to projects like the Routes Project, the Forest Service must consult "at the earliest possible time," which, in this case, was the earliest possible time after the species was listed.  As to plans like the Forest and Dunes plans, where a forest plan is already approved at the time of listing or habitat designation, as here, the Forest Service has five years from the listing or habitat designation, whichever is later, to consult as to that plan.  *See* 16 U.S.C. § 1604(d)(2) (providing plan-level consultation requirements); *see also* 50 C.F.R. § 402.16(a)(1)–(3) ("An agency shall not be required to reinitiate consultation after the approval of a land management plan . . . *provided that* any authorized actions that may affect the newly listed species or designated critical habitat will be addressed through *a separate action-specific consultation.*") (emphases added).

In sum, the Forest Service violates ESA Section 7(a)(2) by failing to reinitiate and complete consultation with FWS as to the Routes Project.

B.    *The Forest Service violates the ESA by failing to initiate consultation on the issuance of SUPs for commercial OHV events.*

Plaintiff contends that the Forest Service violates ESA Section 7(a)(2) by failing to initiate and complete consultation as to the issuance of SUPs for commercial OHV events on the Dunes on and adjacent to critical habitat.  *Id.* at 20.

In June 2024, the Forest Service prepared a biological evaluation ("BE") in which it determined that the 2024 commercial OHV event would have "no effect" on the marten or its habitat.  *See* AR09443 (BE for CE).  The Forest Service contends

Page 26 – OPINION AND ORDER

that its "no effect" determination exempts it from the ESA consultation requirement. USFS Mot. at 19.

The ESA requires consultation where a proposed agency action may affect threatened or endangered species to ensure that the action "is not likely to jeopardize the continued existence" of any listed species "or result in the destruction or adverse modification" of the species' critical habitat. 16 U.S.C. § 1536(a)(2); *see also* 50 C.F.R. § 402.14(a) ("Each Federal agency shall review its actions at the earliest possible time to determine whether any action *may affect* listed species or critical habitat." (emphasis added)). "An agency may avoid the consultation requirement only if it determines that its action will have 'no effect' on a listed species or critical habitat." *Karuk Tribe*, 681 F.3d at 1027. "[A]n agency's 'no effect' determination under the ESA must be upheld unless arbitrary and capricious." *Kraayenbrink*, 632 F.3d at 481.

> 1.    *The permitted events may affect the coastal marten.*

The threshold for triggering ESA consultation is low. "Any possible effect" triggers the consultation requirement even where the effect is "beneficial, benign, adverse or of an undetermined character[.]" *Karuk Tribe*, 681 F.3d at 1027. A plaintiff need show "only that *an* effect on listed species or critical habitat is plausible." *Ctr. for Biological Diversity*, 698 F.3d at 1122 (emphasis added).

The record shows that the commercial OHV events "may affect" the coastal marten or its habitat because the events direct activities into and provide access to areas that are on or adjacent to critical habitat. The events occur in "three relatively

Page 27 – OPINION AND ORDER

large and geographically distinct OHV riding areas (North, Middle, and South)[]" on the Dunes.  Holman Decl. ¶¶ 1–4, ECF No. 58-1.  As recounted above, OHV riding in the North and Middle Riding areas is on or adjacent to marten critical habitat. Commercial OHV events conduct activities, direct riders, and provide access to areas of critical habitat.  For example, in the Middle Riding area (the Umpqua Dunes), both DuneFest and Winchester Bay UTV Takeover conduct riding activities and provide access to areas that are on or adjacent to habitat and corridors.  *See* AR08979, AR08982 (2023 DuneFest SUP) (map of Umpqua Dunes, showing routes and activities encircling marten habitat); AR07329 (2020 Restoration Project Maps) (map of Umpqua Dunes, showing same area with marten habitat in purple and corridors in yellow).

The same is true in the South Riding Area.  The Coos Bay UTV Takeover conducts riding activities and provides riding access to South Riding areas that are on or adjacent to marten critical habitat and corridors.  Holman Decl. ¶ 5 ("The UTV Takeover event takes place in the southern riding area[.]").  Routes for UTV Takeover's "Day Ride" and "Treasure Hunt" are on or adjacent to marten habitat and cross three large marten corridors.  *See* AR09580–81 (2024 UTV Takeover SUP) (map of Day Ride route); AR09586–87 (same) (map of Treasure Hunt route); AR07330–31 (Restoration Project EA) (map of South Riding area, with marten habitat in purple and corridors in yellow—two to the east of Spirit and Horsfall Lakes and one to the west).  The map shows that, at the 2024 event, "treasure" appears to be placed on or

Page 28 – OPINION AND ORDER

adjacent to habitat and on a large corridor.  AR09586 (2024 UTV Takeover SUP) (Treasure Hunt map showing treasure planted on or adjacent to habitat).

"There is no dispute that [OHVs] profoundly change the lands across which they travel."  *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1123 (9th Cir. 2010).  The Ninth Circuit has recognized that OHVs "transform remote areas into motorized recreation zones[.]"  *Id.*  That the commercial OHV events conduct activities on and provide riders access to Dunes areas that are on or adjacent to critical habitat is sufficient to trigger the ESA consultation requirement.  But Plaintiff has met its burden in several ways.  Plaintiff points to record evidence of "at least three ways" the permitted events "may affect" the marten or its habitat: (1) destruction and fragmentation of forested and vegetated habitat and corridors; (2) noise and other anthropogenic disruption that impair the marten's key survival behaviors; and (3) vehicle strikes.  Pl. Mot. at 20.

### a. *Vegetation destruction and fragmentation*

The record shows that commercial OHV events cause destruction and fragmentation of vegetation and forest, potential marten habitat.  The events "trigger an unusually large concentration of OHV activity within the event's permitted operating area."  AR08941 (June 2023 Brooke Letter discussing problems arising from events' "concentrated use" of the Dunes); *see also* AR09067 (November 2023 Center Letter) (the UTV Takeover, held annually since 2015, is marketed as the "West Coast's BIGGEST UTV community event!" and is attended by thousands)

Page 29 – OPINION AND ORDER

AR9223 (January 2024 Brooke Letter) (the 2023 UTV Takeover had 3,197 ticketed attendees).

Commercial OHV events feature large group riding activities such as treasure hunt and night rides that involve up to 75 vehicles riding together. *See*, *e.g.*, AR09562–65 (2024 Coos Bay UTV Takeover SUP) (describing activities); AR08982 (2023 DuneFest SUP) (schedule of activities). Such activities bring large groups of riders into marten habitat and corridors, including at night when martens hunt for food. The 2024 UTV Takeover "Night Ride" directed large groups of OHVs through two large marten corridors. AR09580 (UTV Takeover SUP) (depicting map of South Riding Area marked with Night Ride route). "The treasure hunt . . . historically takes place all day Friday and Saturday and includes up to 40 vehicles." AR09223 (January 2024 Brooke Letter). As reviewed above, the 2024 UTV Takeover "Treasure Hunt" directed OHVs into remote areas near dense vegetation, likely essential coastal marten habitat, and appeared to place treasure in potential habitat and corridors. AR09586–97 (2024 Coos Bay UTV Takeover SUP) (map of treasure hunt locations); AR07331 (Restoration Project Maps) (depicting marten habitat and corridors); *see also* Holman Decl. ¶¶ 1, 11(a), ECF No. 58-1 (The UTV Takeover "treasure hunt" draws OHV traffic to "long, uneven boundaries of areas that contain vegetation that coastal marten could use as habitat" because "the vendor likes to hide some posts in areas of vegetation close to open sand that are not easy to spot.").

The record shows that "unauthorized" OHV intrusions into vegetated areas during the events is a recurrent problem and that the Forest Service has not

Page 30 – OPINION AND ORDER

meaningfully enforced closures of habitat or potential habitat areas. *See, e.g.*, Holman Decl. ¶ 11 (explaining that open riding areas used during events are adjacent to potential marten habitat and that concentrated use of these areas because of events creates a higher potential for OHVs to use illegal user-created routes through vegetation because "it's a challenge to navigate OHVs in these [thickly vegetated] areas."); AR06716 (Routes Project ROD) (explaining how trail use can cause "gradual breakdown of upland forests"); AR08724 (2023 OHV Dunes Sound Project) (proposing "[h]eavy [law enforcement] field presence" to address the problem of unauthorized OHV intrusion into closed areas during UTV Takeover); AR06294–95 (Routes Project BiOp) (discussing the problem of unauthorized OHV intrusion into closed areas and lack of adequate signage, "the destruction or removal of signs," the lack of formal closure orders, and failure to actively enforce closures); AR09221 (January 2024 Brooke letter) (stating that Forest Service does not use fences to protect marten habitat because "we have found this is not an effective deterrent method"); Curry Decl. ¶¶ 38–40, 46, ECF No. 49 (observations of OHV-caused vegetation destruction in the South Riding area, including all the way up to fenced private property boundary); AR09244 (March 2024 NOI) (aerial photo of Umpqua Beach Middle Riding area showing OHV-caused vegetation destruction and an adjacent area with intact vegetation that is closed to protect the snowy plover); *see also* AR09245-46 (same) (photos of forest and vegetation destruction adjacent to trails and open riding areas on the Dunes, showing OHV-caused severely eroded cutbanks, and showing tree

Page 31 – OPINION AND ORDER

islands each with a single remaining tree encircled by OHV tracks in previously vegetated area).

The record shows that habitat destruction impairs key marten survival behaviors and makes them susceptible to injury or death. AR07154 (Status Assessment) (explaining that habitat fragmentation causes decreased marten fitness that "can consequently affect predator elusion and avoidance, foraging, reproduction, and ability to fight off disease and infection"). Destruction and fragmentation of marten habitat and corridors pose the greatest threat to the marten's survival in Oregon. AR06750 (Moriarty et al., 2016); *see also* AR07345 (Restoration Project EA) (explaining that the Oregon Dunes marten population is "vulnerable to extirpation" because of its small size and isolation from other populations); AR08001 (Listing Rule) (stating same); AR08053 (Recovery Outline) (same).

           b.    *Noise and other human disturbance*

The record also shows that commercial OHV events cause noise and other human disturbances that may impair key marten survival behavior. High levels of OHV noise is a persistent problem during the events. AR08720–24 (2023 OHV Sound Project) (noting that nearby residents and recreationists have complained about "disruptive noise emissions" from Dunes OHVs and that the noise has gotten worse and identifying the UTV Takeover noise problem). Though the Dunes Plan directs the Forest Service to "[e]nforce . . . [OHV] noise goals of 95 decibels beginning in 1997 and 90 decibels in 1999[,]" AR03713 (Dunes Plan) (AW-10), the Forest Service uses a 93-decibel noise limit, AR08721 (2023 OHV Dunes Sound Project). Noise

Page 32 – OPINION AND ORDER

measurements from vehicles at the commercial OHV events since 2000, obtained, in part, through voluntary "courtesy," testing by riders, show that "only 44% of all vehicles tested since 2000" complied with the Dunes noise limit of 93 decibels. AR08721 (same). Data from 2015–2020 show a 35% compliance rate. *Id.* Noise measurement data from the 2023 UTV Takeover found that only 27% of tested vehicles complied with the 93-decibel noise limit with 39% testing at 100 decibels or higher, and some vehicles testing as high as 122 decibels. AR09081 (UTV Takeover Sound Testing Stats). The agency found that "OHVs with modified mufflers tend to be louder than stock vehicles." AR08721 (2023 OHV Dunes Sound Project). Further, it found that "unmodified" OHVs (*i.e.*, that is, with mufflers in place) had a 50% compliance rate, while "modified" OHVs (without mufflers) had a 12% compliance rate. *Id.* The agency concluded that "the 93 [decibel] standard may not be readily attainable for many unmodified OHVs," let alone modified OHVs. *Id*. To mitigate the lack of compliance, the agency proposed increasing the noise limit from 93 to 99 decibels. *Id.*

The record shows that there is no meaningful enforcement of noise limits at the events. *See*, *e.g.*, AR09089 (UTV Takeover Early Assessment Meeting) ("It does not seem like having permit holders do their own [noise] testing is working well. It isn't happening, or we are receiving poor data."); *Id.* (discussing UTV Takeover noise problem, suggesting ways to increase voluntary self-testing, noting that "[organizer of] UTV Takeover suggested some sort of raffle to encourage sound testing by participants[,]" and  suggesting the use of "possible increased tools for education on

Page 33 – OPINION AND ORDER

sound maintenance of machines[,]" and "a booth inside the events . . . for education"); AR08724 (proposing solutions for UTV Takeover noise problem including "revisions to . . . operating area for treasure hunts and guided [group] rides," "requirements for sound checks and enforcement," and "treat[ing] [the UTV Takeover] as a recreation *incident*" to bring in law enforcement).

The record shows that the events provide large group sand camping that increases human disturbance on the Dunes. *See, e.g.*, AR09541–601 (2024 UTV Takeover SUP) (authorizing use of standard and group sand campsites—converted into concentrated camping PODS to accommodate about 3,200 people and 800 trailers on sand abutting potential habitat); *see also* AR04579–81 (Sand Camping Project EA) ("Overcrowding in small geographical locations in the off-road environment has contributed to 'out-of-control' conditions in the areas of these large camps. Often a crowd mentality takes over, leading to group efforts at intentional violation of laws and regulations.").

The record shows that the "best available science" concludes that OHV-generated and other anthropogenic noise and disruption adversely impacts wildlife in general and members of the mustelid family in particular by disrupting key survival behaviors.[4]   Such noise and disruption may "directly interfere with signal

---

[4] *See, e.g.,* SuppAR150, 153 (Barja et al., 2007) (concluding that human disturbance evoked stress responses in pine martens in "natural parks"); SuppAR141, 147 (Barber et al., 2009) (finding that anthropogenic noise causes "increased vigilance behavior" and decreased food-seeking behavior that "begin to appear at . . . 55–60 dB(A)" and concluding that "the preponderance of evidence argues for immediate action to manage noise in protected natural areas."); SuppAR169 (Chan & Blumstein, 2011) (Anthropogenic noise may "directly interfere

processing or communication, or directly harm animals" and may also "distract individuals and . . . interfere with their ability to make biologically important decisions about food selection, mate selection, and predator detection"). SuppAR169–75 (Chan & Blumstein 2011); *see also* AR07187 (2019 Status Assessment) (concluding same). The record shows that the agency declined to consider and extrapolate data from the best available science before it.

The record shows that commercial OHV events occur during coastal marten denning season and that the survival of marten offspring is critical to the species' continued existence. SuppAR 160–68 (Delheimer et al., 2021).[5F] Kits den from June through September—a particularly critical time for continued coastal marten existence. *Id.* at 162. "The 3 [months] following parturition appears to be the most

_____

with signal processing or communication, or directly harm animals" and may also "distract individuals and . . . interfere with their ability to make biologically important decisions about food selection, mate selection, and predator detection"); SuppAR 180 (Francis & Barber, 2013) ("Chronic and frequent noise interferes with animals' abilities to detect important sounds [and] intermittent and unpredictable noise is often perceived as a threat" leading to decreased fitness); SuppAR190 (Kight & Swaddle, 2011) ("The scope and magnitude of anthropogenic noise pollution are often much greater than those of natural noise and are predicted to have an array of deleterious effects on wildlife."); SuppAR293 (Miller et al., 2020) (summarizing findings of 19 studies: "[D]isturbance from motorized recreation (*e.g.*, OHVs) can result in physiological changes such as reduced body mass and increased stress response [and] behavioral changes such as altered movement patterns, increased vigilance, increased flight response, displacement, and avoidance of road corridors[.]" And "[m]otorized recreation can also cause direct mortality, especially when vehicles are moving quickly."); SuppAR451 (Ortiz-Jiménez et al., 2021) (concluding from study of European mink that roads and tourism, often "carried out in large groups" can alter the mammal behavior strategies that enable survival); SuppAR466 (Siemers & Schaub, 2011) (concluding from study of bats that traffic noise "can affect the foraging efficiency of acoustic predators such as bats and probably also owls, some nocturnal primates, carnivores and others" and urging that noise emissions "be considered for the assessment of environmental impact of human activities.").

Page 35 – OPINION AND ORDER

critical portion of the denning period for martens." *Id.* at 164. "The death of a female marten at any time prior to kit independence could result in the death of her kits as well; if the female died within the first 2 [months], kit death would be an almost certain outcome, resulting in the simultaneous loss of multiple generations." *Id.* at 165.

### c.    *Risk of vehicle strike*

Finally, the record shows that both the heavy attendee vehicle traffic on Highway 101 and the high concentration of OHV traffic on the Dunes may increase the risk of marten death by vehicle strike. Marten strikes on Highway 101, which forms the long eastern edge of the Dunes, have been regularly documented from marten roadkill. AR06750 (Moriarty et al., 2016); *see also* AR09070 (February 2024 Center Letter) ("At least three marten roadkill events were documented on Oregon Coast Highway 101 between April 2019 and June 2020[.]"). "[T]he central coastal Oregon population was noted as being substantially more vulnerable to animal-vehicle collisions than the other three [coastal marten DPSs]." AR09481 (7(d) determination). "US-HWY 101, where most of the marten roadkill have been recorded, crosses coastal habitats in close proximity to the [Dune]'s entire eastern edge." AR09482 (same) (concluding that "traffic volume [on Highway 101] is potentially influenced by recreation within the [Dunes]"). The commercial events draw thousands of attendees who are likely to travel on Highway 101, the only major ingress and egress to the Dunes. AR09693 (Letter Re: UTV Takeover) (explaining that, due to increased traffic during an event, "recreational users outside of the event

Page 36 – OPINION AND ORDER

struggled to get to their destination"); AR08049 (UTV Takeover Meeting Notes) (describing congestion of people and vehicles during permitted events). Increased traffic volume during the events supports the inference that the events may increase the risk of marten strike on Highway 101. Forest Service staff have raised concerns about marten deaths from vehicle strikes on Highway 101. SuppAR528 (UTV Takeover Planning Meeting); *see also* AR09662 (Forest Service Comments on Proposed Critical Habitat) (explaining that martens trying to disperse beyond occupied habitat in the Dunes are "frequently struck by vehicles").

The increased number and concentration of OHVs on the Dunes during the events supports a similar inference that the events may increase the risk of marten strikes by OHV riders on the Dunes. The Forest Service acknowledges that "the marten population within the Oregon Dunes is uniquely exposed to recreational vehicles." AR09481 (7(d) determination). However, the Forest Service concluded that because no studies had been done as to the risk of marten strikes by OHVs on the Dunes during the events, it could not determine whether OHV strikes posed a risk to the coastal marten. AR09482 (same).

In sum, the record shows that the permitted commercial OHV events on the Dunes "may affect" the coastal marten or its habitat.

2.     *USFS's "no effect" finding is arbitrary and capricious.*

The Forest Service BE contends that the permitted commercial OHV event will have "no effect" on the martin or its habitat because the "[a]ctivities would not introduce recreation into new areas nor damage or remove vegetation[,]" "[n]o

Page 37 – OPINION AND ORDER

vegetation disturbance would be permitted as part of the proposed permit-specific activities[,]" "[p]roposed action would occur primarily along paved roads, designated sand routes, and open sand areas, which do not contain required habitat elements[,]" and "activities are consistent with . . . existing [Forest and Dunes Plans] Standards and Guidelines." AR09443 (BE for CE). The BE concludes that, due to an elevated baseline for noise and disturbance, that "no additional disturbance [is] expected outside the action area." AR09443 (same).

The Forest Service concedes that "it is possible that ongoing OHV use impacts the coastal marten[.]" USFS Mot. at 19. And, as reviewed above, the Forest Service has documented extensive effects of the permitted events on the marten or its habitat. *See, e.g.*, AR09465–92 (7(d) determination) (analyzing the effects of OHV use on coastal martens including anthropogenic noise, traffic and potential vehicle collisions, and vegetation impacts); AR09490–91 (same) (discussing "localized" OHV impacts to marten habitat with potential to "affect marten individuals or population persistence"). That is sufficient to trigger the consultation requirement.

However, the Forest Service maintains that consultation is triggered only when effects are "reasonably certain to occur." But that is not the standard. The Ninth Circuit has explained that "may affect" is "defined broadly to ensure compliance with the ESA's substantive protections[,]" *Ctr. for Biological Diversity v. United States Env't Prot. Agency*, 168 F.4th 1164, 1181 (9th Cir. 2026), that is, to "insure" through consultation that an agency action is "not likely to jeopardize the continued existence of any [listed species] or result in the destruction or adverse

Page 38 – OPINION AND ORDER

modification of habitat of such species[,"] 16 U.S.C. § 1536(a)(2). Relying on *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024), the Ninth Circuit rejected the agency's "reasonably certain to occur" standard as inconsistent with the statutory text. *Id.*; *see also Loper Bright*, 603 U.S. at 413 ("[C]ourts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous."). The court explained that "the *Karuk Tribe* en banc court" set out the proper standard: "*[a]ny possible effect* triggers the requirement" and "only if an agency determines that its action will have 'no effect' is it exempt from consultation." *Id.* (cleaned up) (emphasis in *Ctr. For Biological Diversity*); *see also Ctr. for Biological Diversity v. U.S. Dep't of Interior*, ___ F. Supp. 3d ___, No. 24-cv-04651-JST, 2026 WL 898264, at *11 (N.D. Cal. Mar. 30, 2026) ("The [c]ourt agrees that requiring effects of the action to be 'reasonably certain to occur' before the Services can consider them violates the statute's text[.]"). A plaintiff thus need only show, as it has here, that the permitted events "may affect" the marten or its habitat.

The Forest Service also maintains that the permits themselves "cause no effects" because the permits "prescribe limits on otherwise allowable activity under the Dunes Plan." USFS Mot. at 19. That is, the Forest Service argues that the permitted events will have no effect because the Forest Service will limit those effects with a permit. USFS Mot. at 20. Even if that were the case—and the record shows that the Forest Service has been unwilling or unable to manage the permitted events—whether the effects are mitigated is irrelevant. The Forest Service's contention is itself based on the premise that effects may occur. Any possible effect

Page 39 – OPINION AND ORDER

triggers the consultation requirement even where the effect is "discountable [or] insignificant." AR03874-75 (ESA Consultation Handbook).

The Forest Service contends that its "no effect findings are rational because the special use permits do not allow or expand OHV use beyond what is already allowed under the relevant land use plans," USFS Mot. at 22, or what is already authorized, *id.* at 21, or "would occur no matter what," *id.* at 20; *see also* AR09445 (BE for CE) (concluding that the permitted events will have no "noise, human presence or vehicle traffic" effects on the marten because the events do not elevate the baseline levels of those factors). The Forest Service seeks to discount any effect on the marten or its habitat by subtracting a baseline. But even potentially "discountable" effects trigger consultation. AR03874–75 (ESA Consultation Handbook).

Here, the question is not complicated. At this early stage of ESA compliance, the question is whether the agency action "may affect" the species or its habitat. "Any possible effect" thus triggers consultation. The Forest Service effectively concedes and the record shows that the permitted events may affect the marten or its habitat. Accordingly, because the agency's "no effects" determination runs counter to the evidence, it is arbitrary and capricious and is set aside. The Forest Service's "no effect" determination is also invalid because the agency failed to consider the best available science. "An agency complies with the best available science standard so long as it does not ignore available studies, even if it disagrees with or discredits them." *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir.

Page 40 – OPINION AND ORDER

2014) (quoting *Sw. Ctr. for Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir.2000)).

For the reasons above, the Forest Service violates ESA Section 7(a)(2), ESA's consultation requirement, as to the Routes Project and as to the issuance of SUPs for commercial OHV events on the Dunes. Accordingly, Plaintiff is entitled to summary judgment on both of its ESA claims.

III.    *NEPA Claim*

Plaintiff contends that the Forest Service violates NEPA and the APA by "unlawfully relying on a categorical exclusion to circumvent required environmental analysis of the SUPs." Pl. Mot. at 25.

Where a proposed action falls in a category of minor actions that normally do not significantly affect the human environment, a categorical exclusion ("CE") may apply and the agency need not prepare an EA or EIS. 42 U.S.C. § 4336e(1) (defining "categorical exclusion"); 36 C.F.R. § 220.6(a), (b)(1) (2020); 7 C.F.R. § 1b.3 (2025). CEs apply only where the proposed action is "within a category" and involves no "extraordinary circumstances." *Id.* The Forest Service NEPA regulations list seven "[r]esource conditions that should be considered in determining whether extraordinary circumstances . . . warrant further analysis and documentation in an EA or EIS." 36 C.F.R. § 220.6(b) (2020). Those resources include "[f]ederally listed threatened or endangered species or designated critical habitat . . . [and] national

Page 41 – OPINION AND ORDER

recreation areas"  *Id.* § 220.6(b)(1)(i),(iii) (2020); 7 C.F.R. § 1b.3(f)(1)(i),(iv) (2025).[5]

An extraordinary circumstance exists where there is certain significant effect or reasonably uncertain significant effect.

Here, the Forest Service applied a CE to the 2024 SUP.  *See* AR09256–69 (CE) (identifying the category).[6]    Relying on its BE, the Forest Service determined that the commercial OHV event would have "no effect" on the marten or its habitat, AR09259, AR09261 (CE).  And it determined that the commercial OHV event would have "no effect" on the national recreation area.  AR09259 (CE).  The agency further determined that "there [wa]s no uncertainty" as to "degree of potential effect[,]" of the permitted events on either resource.  AR09259, AR9260.  Having made the "no effect" and "no uncertainty" determinations, the Forest Service concluded that neither resource is an extraordinary circumstance.  It then promulgated a CE to exclude the SUP from further NEPA review.  AR09266.

Plaintiff contends that the Forest Service's "no effect" determination and its application of the CE is arbitrary and capricious because the agency "entirely ignores evidence of significant impacts to resource conditions" (*i.e.*, to the coastal marten or

---

[5] The U.S. Department of Agriculture's NEPA regulations for CEs have been recodified at 7 C.F.R. § 1b.3, 1b.4. 90 Fed. Reg. 29646, 29654 (July 3, 2025). Defendants maintain that "[t]o the extent there is a difference between the two sets of regulations," the 2020 version in effect when the challenged 2024 permit was issued controls.  USFS Mot. at 4 n.2.

[6] The Forest Service provides that the action falls with category 6(d)(12): "Issuance of a new authorization or amendment of an existing authorization for recreation special uses that occur on existing roads or trails, in existing facilities, in existing recreation sites, or in areas where such activities are allowed."  36 § C.F.R. 220.6(d)(12)).

Page 42 – OPINION AND ORDER

its habitat and to the national recreation area) and its decision "runs counter to the evidence[.]"  Pl. Resp.at 20.

NEPA compliance is reviewed under the APA's arbitrary and capricious standard.  *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969, 973 (9th Cir.2003); 5 U.S.C. § 706.  Where an agency applies a categorical exclusion and "decides to proceed with an action in the absence of an EA or EIS, the agency must adequately explain its decision."  *Sierra Club v. Bosworth*, 510 F.3d 1016, 1026 (9th Cir. 2007) (quoting *Alaska Ctr.*, 189 F.3d at 859).  A court must find that the record contains adequate evidence to support the agency's decision, as well as the evidence that the agency stated it relied on in reaching its decision.  *Oregon Wild v. United States Forest Serv.*, 819 F. Supp. 3d 1185, 1204 (D. Or. 2026) (citing *State Farm*, 463 U.S. at 43).

A.    *The marten and its habitat is an extraordinary circumstance.*

Relying on its BE, the Forest Service determined that neither the marten nor its habitat is an extraordinary circumstance because a commercial OHV event would have "no effect" on them.  *See* AR09261 (citing the "BE" as the "rationale" for the "no effect" determinations).  The Court has concluded that the BE's "no effect" determination is arbitrary and capricious.  For that reason, the Forest Service cannot rely on the BE to make its "no effect" and "no-extraordinary circumstances" determinations as to Plaintiff's NEPA claim.  The Court thus looks to other rationale for the agency's "no effect" determinations.

First, the CE provides that "[n]o vegetation impacts [are] expected[]" because there would be "no new ground disturbance" and because "[a]ll OHVs are instructed to remain within paved areas, open riding areas, and/or designated sand routes." AR09257 (CE).  As to ground disturbance, the conclusion is nonsensical because OHVs propel themselves forward by disturbing the ground.  *See, e.g.,* AR07412 (Restoration Project EA) (noting that OHV use on the Dunes "include[s] ground disturbance and sand displacement"); *see also* SuppAR505–07 (Nationwide Ins. 2024) (explaining the difference between types of OHVs and how they work and describing UTVs as "large, powerful, able to seat passengers side by side, and built with lots of storage space" and noting that they "handle[] . . . like a car[,] . . . are faster and more powerful than ATVs, but not as nimble" and have "max speed . . . between 25 mph and 50 mph").  The Forest Service also concludes the commercial OHV event would have no vegetation impacts because the Forest Service would "instruct" participants to "remain" in certain, presumably non-vegetated, areas.  But the record shows that "unauthorized" intrusions into such areas during the events, including potential habitat, are a persistent problem that results in vegetation and forest destruction.  The record shows that the nature of the events incentivizes such intrusions and that the Forest Service appears unable or unwilling to close sensitive areas and enforce closures to protect the marten.  *See, e.g.*, Holman Decl. ¶ 11.b ("Some OHV users like to create new trails through thick vegetation because it's a challenge to navigate OHVs in these areas.  Once a new trail is started, others begin to use these areas, and new trails are developed in vegetated areas over time.  With the concentrated

Page 44 – OPINION AND ORDER

use in these areas because of the event, there is a higher potential for OHVs to try and ride into these areas."); AR06716 (Routes Project ROD) (explaining that some trails involve a "gradual breakdown of upland forests as riders [seek] out challenging riding experiences and hill climbs"); AR06294–95 (Routes Project BiOp) (discussing the problem of unauthorized OHV intrusion into closed areas and lack of adequate signage, "the destruction or removal of signs," the lack of formal closure orders, and failure to actively enforce closures); AR09221 (January 2024 Brooke letter) (explaining that Forest Service does not use fences to protect marten habitat because "we have found this is not an effective deterrent method"); AR08724 (2023 OHV Dunes Sound Project) (noting the need for "[h]eavy [law enforcement] field presence to ensure that closure areas are observed" during the UTV Takeover). Finally, the Forest Service bases its no vegetation effects determination on zero data. *See Sierra Club*, 510 F.3d at 1028 (finding agency's categorical exclusion determination arbitrary and capricious due to "lack of reasoned methodology" and lack of factual support such as "hard data" or other "quantified results"). The record contains data, but that data runs counter to the agency's conclusion. *See*, *e.g.*, AR09244 (March 2024 NOI) (aerial photo showing vegetation area in Umpqua Dunes, Middle Riding Area—likely marten habitat—obliterated by OHV use next to an intact vegetation area that is fenced off to protect the snowy plover).

Second, as to noise impacts, the CE prompted the agency to "[d]escribe how this project would create noise beyond ambient levels." The agency concluded that there would be no noise impacts because "OHV noise levels within the permit area

are expected to be similar to a busy holiday weekend." AR09257 (CE). That conclusion lacks basis in fact, notably available data. The record, reviewed above, shows that noise is a recurrent problem at the events and that there is no meaningful noise limit enforcement. Further, the agency wrongly equates busy holiday weekend noise levels with ambient or baseline noise levels. Even if such comparison were sufficient to make a "no effect" determination, the Forest Service fails to support its conclusion with data. An agency's "assessment of baseline conditions must be based on accurate information and defensible reasoning." *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016) (internal citation and quotation marks omitted).

The record shows that the multi-day commercial events draw thousands and produce "an unusually large concentration of OHV activity" on the Dunes. AR08941 (Letter Re: June 2023 UTV Takeover Curfew). The record also shows that noise is a problem during the events, that the nature of the events incentivizes the use of newer, more powerful, modified (*i.e.*, muffler-less) vehicles that produce noise of up to 122 decibels, and that there is no meaningful noise limit enforcement. AR08721–24 (2023 OHV Dunes Sound Project); AR09081 (UTV Takeover Sound Testing Stats). Army Corps of Engineers measured Highway 101 traffic noise in the Coos Bay area (exact measurement location unknown) "of up to 75 dBA during the day[.]" AR09486 (7(d) determination). The Forest Service uses a noise limit of 93 decibels (though the Dunes Plan directs the agency to use a 90-decibel noise limit). AR08721 (2023 OHV Dunes Sound Project); AR03713 (Dunes Plan) (AW-10). Noise testing is voluntary

Page 46 – OPINION AND ORDER

and performed by the riders themselves, and data show that only a quarter of the tested vehicles comply with the 93-decibel limit, that 39% of vehicles tested at 100 decibels or higher, and some vehicles tested as high as 122 decibels. *Id.*

Finally, specifically as to the marten and its habitat, the CE provides only that "[n]o habitat within Action Area and no additional disturbance expected outside of Action Area due to elevated baseline for noise and human presence associated with the recreation area." AR09444. That is not sufficient. The facts show that habitat is within the action area. As to baseline conditions outside the action area, the Forest Service fails to provide "accurate information and defensible reasoning" to support its assertion that the event would cause no impacts greater than usual. *Great Basin Res.*, 844 F.3d at 1101 (internal citation and quotation marks omitted). As extensively reviewed, the record shows that commercial OHV events bring activity to the Dunes of a different magnitude, intensity, and impact than usual. Finally, the agency fails to analyze the impact on denning martens and the increased risk of marten strike.

The agency's conclusory "no effect" determination lacks factual basis, runs counter to the evidence, and fails to provide reasoned explanation. For that reason, the agency's "no effect" determination as to the marten or its habitat is arbitrary and capricious. The agency fails to show that the marten or its habitat is not an extraordinary circumstance.

Page 47 – OPINION AND ORDER

B.       *The national recreation area is an extraordinary circumstance.*

The Forest Service determined that the national recreation area is not an extraordinary circumstance because the commercial OHV event would have "no effect" on it. AR09256–69 (CE). To support its determination, the Forest Service provided that the"[e]vent takes place within Oregon Dunes National Recreation Area Boundaries[,]" and "[a]ll activities are consistent with the management of the ODNRA." AR09260. It also provided that "[t]he project is within the Oregon Dunes National Recreation Area designated as Management Area (MA)10 and would have no effect on the designated management area." AR09263.

First, that the commercial OHV event takes place within Dunes' boundaries does not mean that the event would have no effects on the Dunes. In fact, the record shows that the events have had significant effects on Dunes natural resources, discussed above, and on public safety and other recreational users such as hikers and wildlife observers, reviewed in more detail below.

Second, the activities are *not* consistent with the governing management plans, the Dunes Plan and the Forest Plan, also reviewed in more detail below. The governing plans include directives to restrict and manage OHV use to protect Dunes resources (like areas of vegetation and forest, listed species, and critical habitat), public safety, and competing Dunes uses. *See, e.g.*, FW-038, FW070, FW007, Dunes Plan B-9. FW-007 directs the Forest Service to "[r]estrict or prohibit specific types of motor vehicles off roads in areas not already restricted if needed to protect resources, provide for public safety, or minimize conflicts among users." AR03737 (Dunes Plan);

Page 48 – OPINION AND ORDER

AR02689 (Forest Plan). And Dunes Plan B-9 directs the Forest Service to "use signs and barriers where necessary to protect special habitats within and adjacent to [open riding areas]." AR03719 (Dunes Plan). That such directives exist presumes that OHV activity has the potential to cause significant impacts on the Dunes. This is especially so where, as here, the permitted events involve "an unusually large concentration of OHV activity" on the Dunes. AR08941. The record shows that the Forest Service has not taken meaningful action to restrict or manage the commercial OHV events to comply with the governing management plans. The Forest Service's "no effect" determination thus lacks factual support, runs counter to the evidence, and lacks reasoned basis. For that reason, it is arbitrary and capricious. The agency fails to show that the Dunes, a national recreation area, is not an extraordinary circumstance.

C.    *Defendants' arguments*

The Forest Service contends that the Court should defer to its "no significant effect" determinations. USFS Mot. at 28. The Forest Service relies on *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. 168, 183 (2025) for the proposition that "[c]ourts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness." *Seven County* involved a challenge to an agency's EIS, not a challenge to a categorical exclusion from further NEPA review. Even so, *Seven County* did not grant an agency discretion to forgo reasoned analysis, nor did it exclude NEPA-related agency decisions from APA review. *Seven County* reaffirms

Page 49 – OPINION AND ORDER

that agency decision-making must be "reasonable and reasonably explained." *Id.* at 180. Here, the agency's decisions are neither. They lack factual basis, run counter to the evidence, and lack a rational connection to the facts before it. "An agency cannot avoid its statutory responsibilities under NEPA merely by asserting that an activity it wishes to pursue will have an insignificant effect on the environment." *Alaska Ctr.*, 189 F.3d at 859 (internal citation and quotation marks omitted). "The agency must supply a convincing statement of reasons why potential effects are insignificant." *Id.* The Forest Service has not provided a convincing statement of reasons to explain why the SUP impacts are insignificant, as required to bypass further environmental review under NEPA.

The Forest Service also contends that the Court should defer to its expertise. "[W]hether an action . . . fits within [a] categorical exclusion is a factual determination that implicates substantial agency expertise[.]" *Id. at* 858 n.5. But here, the Forest Service "does not reveal its methodology or offer any quantified results supporting its conclusory statements." *Sierra Club*, 510 F.3d at 1028. Under APA review standards, that is insufficient. A court need not rely on an agency's bald assertions of expertise. *See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989).

In sum, the Court concludes that the agency's determinations that the permitted commercial OHV event would have "no effect" on the marten or its habitat or on the national recreation area are arbitrary and capricious and are set aside. Accordingly, the agency's decision to apply a categorical exclusion to the issuance of

Page 50 – OPINION AND ORDER

an SUP for the commercial OHV event on the Dunes is arbitrary and capricious and is set aside.  Plaintiff is entitled to summary judgment on its NEPA claim.

IV.    *NFMA Claim*

Plaintiff contends that that "the Forest Service is violating NFMA because its permits for riding events fail to comply with four applicable standards and guidelines set forth in the Forest Plan and the Dunes Plan."  Pl. Mot. at 29.

The Dunes is managed by the Forest Service as part of the Siuslaw National Forest.  Dunes management is governed by the 1994 Oregon Dunes Management Plan ("Dunes Plan") and the 1990 Forest Plan for the Siuslaw National Forest ("Forest Plan").  *See* AR02608-923 (Forest Plan); AR03660-813 (Dunes Plan).  Under NFMA, all site-specific projects and activities, including permits, must comply with approved management plans.  16 U.S.C. § 1604(i); 36 C.F.R. § 219.15(b), (d).  "A project is consistent if it conforms to the applicable 'components' of the forest plan, including the standards, guidelines, and desired conditions that are set forth in the forest plan and that collectively establish the details of forest management."  *All. for the Wild Rockies v. U.S. Forest Serv.*, 907 F.3d 1105, 1110 (9th Cir. 2018).  The failure to comply with the provisions of a forest plan is a violation of NFMA and is reviewed under the APA's arbitrary and capricious standard.  *Native Ecosystems Council*, 418 F.3d at 965; 5 U.S.C. § 706(2)(A).

Plaintiff contends that the Forest Service violates the NFMA by failing to comply with four directives in the governing management plans: (1) FW-038 (directing Forest Service to prepare a biological (field) evaluation and to "assure that

Page 51 – OPINION AND ORDER

species do not become threatened or endangered because of Forest Service actions"); (2) FW-070 (directing Forest Service to manage activities and project so as not to "reduce suitability of habitat needed to maintain viability of species"); (3) FW-007 (directing Forest Service to restrict or prohibit OHVs "in areas not already restricted if needed to protect resources, provide for public safety, or minimize conflicts among users"), (4) Dunes Plan B-9 (directing Forest Service to "use signs and barriers where necessary to protect special habitats within and adjacent to [open riding areas]").

### A.    *FW-038 requires the agency to protect listed species.*

FW-038 provides that when a listed species is present, the Forest Service is to "perform a biological (field) evaluation" and provides that "[m]anagement practices and use of species management guides shall assure that species do not become threatened or endangered because of the Forest Service actions."  AR03742 (Dunes Plan); AR02693 (Forest Plan).  Plaintiff alleges that the Forest Service failed to perform a field evaluation and failed to prepare a BE that meets the Forest Service standards as stated in the Forest Service Manual ("Manual").[7]  Pl. Mot. at 30.

The Manual defines a BE, in relevant part, as a documented review of agency actions in sufficient detail to comply with ESA requirements, "ensure that actions do not contribute to loss" of listed species, and "provide a standard . . . to ensure that [listed] species and critical habitats receive full consideration in the Forest Service

---

[7] The Forest Service uses its Manual in conjunction with the Dunes Plan to direct its decision making as to Dunes management.  AR03761 (Dunes Plan) (providing that the Dunes Plan "will be used in conjunction with the Siuslaw Forest Plan, Forest Service Manuals and Handbooks").

Page 52 – OPINION AND ORDER

decision-making." Forest Service Manual 2670.5. The manual requires that a BE include an "analysis of the effects on the listed species or their habitat" or on "any unoccupied habitat required for recovery" and a cumulative effects analysis. *Id.* 2672.42(3), (4).2.

The Forest Service contends that the SUP complied with FW-038 because the agency completed a BE and determined that the commercial OHV event would have "no effect" on the marten or its habitat. The Forest Service also contends that it is not bound by the Forest Service Manual because the Manual "does not act as a binding limitation on the Service's authority." USFS Mot. at 30 (quoting *W. Radio Servs. Co. v. Espy*, 79 F.3d 896, 901 (9th Cir. 1996) (citation modified)); *see also Lumber, Prod. and Indus. Workers Log Scalers Local 2058 v. United States*, 580 F. Supp. 279, 283 (D. Or. 1984) (describing the manual as "basically a large compilation of guidelines" and "not a substantive rule" (citation modified)).

The Forest Service does not dispute that FW-038, which is legally binding, requires it to do a field evaluation as part of its BE and that it failed to do a field evaluation. As to the Manual, it is not legally binding because, unlike the Dunes and Forest Plans, the Manual was not adopted in accordance with the APA's procedural requirements. *Western Radio,* 79 F.3d 896, 901–02 (9th Cir. 1996). However, the question is not whether the Manual legally obligates the Forest Service to conduct a BE. It is the ESA that legally obligates the Forest Service to conduct a BE where, as here, a proposed action may affect a listed species or its habitat. The Manual instructs the Forest Service how to prepare a BE that complies with the ESA.

Page 53 – OPINION AND ORDER

The Court has already determined that the Forest Service's BE was arbitrary and capricious because it's "no effect" determination runs counter to the evidence. Further, the Forest Service failed to conduct a field evaluation as part of its BE, as required by the directive' plain language, and the Forest Service failed to manage the permitted events to protect a listed species, as required by FW-038. Accordingly, the SUP for the 2024 and other commercial OHV events on the Dunes do not comply with the governing management plans and violate the NFMA.

B.    *FW-070 requires the agency to protect critical habitat.*

FW-070 directs the Forest Service to "manage activities and projects so they do not reduce suitability of habitat needed to maintain viability of species." AR03745 (Dunes Plan); AR02694 (Forest Plan). It also directs the Forest Service to "determine acceptable levels of effects on the habitat" and to ensure that those levels are not exceeded by undertaking measures such as "support of research, intensive evaluation of habitat conditions, and temporary or intermittent restrictions on public use." *Id.*

The Forest Service contends that "Plaintiff fails to point to anything in the record showing that approval of the special use permits reduced the suitability of habitat needed to maintain marten viability." USFS Resp. at 33.

First, the management plans direct the Forest Service to determine acceptable levels of effects on marten habitat. The Forest Service does not dispute that it has not conducted the analysis required to determine such levels, either in its BE or in FWS consultation. Second, the record shows that the Forest Service has not taken any of the steps prescribed by FW-070 to protect the habitat—steps such as research

Page 54 – OPINION AND ORDER

on habitat impacts, "intensive evaluation" of habitat conditions, or the use of "temporary or intermittent restrictions" to protect that habitat.  In its CE, the Forest Service determined that it was complying with management plan directives because "the permit . . . directs activities (treasure hunt, sand camping) away from vegetated areas[.]"  AR09259.  Even if this measure were sufficient to mitigate effects of the permitted event—and the record shows that it was not—such efforts are insufficient to satisfy FW-070, by the directive's plain language.

In both its BE and its CE, the Forest Service stated that the commercial OHV event would have "no effect" on marten habitat because the event complied with "existing [management plan] Standards and Guidelines" to "conserve the critical habitat's Physical and Biological features necessary for the marten."  AR09443 (BE for CE); AR09259 (CE).  But the commercial OHV event does not comply with FW-070 or other applicable standards and guidelines, discussed in this section, to protect marten habitat.

Because the Forest Service fails to manage the commercial OHV events "so they do not reduce suitability of habitat needed to maintain viability" of the coastal marten, Forest Service violates FW-070.  Accordingly, the SUP for the 2024 and other commercial OHV events on the Dunes do not comply with the governing management plans and violate the NFMA.

C.    *FW-007 requires the agency to restrict OHV use to protect resources.*

FW-007 directs the Forest Service to "[r]estrict or prohibit specific types of motor vehicles off roads in areas not already restricted if needed to protect resources,

provide for public safety, or minimize conflicts among users." AR03737 (Dunes Plan); AR02689 (Forest Plan).

The Forest Service contends that it complied with FW-007 because "[it] struck a balance" between  FW-007 and FW-006, which directs the Forest Service to "[p]ermit the use of motor vehicles off roads, except where specified otherwise[.]" USFS Reply at 22–23 (quoting AR03737 (FW-006)).

The plain language of FW-006, "except where specified otherwise," indicates that FW-006, (permitting the use of motor vehicles off roads) is subject to limitation by FW-007 (directing Forest Service to restrict or prohibit such vehicles "in areas not already restricted if needed" to protect resources, public safety, and competing uses). FW-006 is also limited by directives that require the agency to manage activities, including OHV activities, to protect listed species and critical habitat, for example, FW-070 (directing Forest Service to "manage activities and projects so they do not reduce suitability of habitat needed to maintain viability of species") and Dunes Plan B-9 (directing Forest Service to "use signs and barriers where necessary to protect special habitats within and adjacent to [open riding areas]"), discussed below. AR03745 (Dunes Plan FW-070); AR02694 (Forest Plan FW-070); AR03719 (Dunes Plan B-9).

The record shows that commercial OHV events on the Dunes impair natural resources (such as vegetated and forested areas of the Dunes, listed species, and designated habitat), public safety, and competing recreational uses.  In addition to forest and vegetation damage, noise and other disruption from event activities, the

Page 56 – OPINION AND ORDER

record also shows that the events impair public safety and competing uses. *See, e.g.,* AR08720–24 (2023 OHV Dunes Sound Project) (explaining that "[n]earby residents and recreationists have submitted numerous complaints about disruptive OHV noise emissions at the [Dunes]," identifying the UTV Takeover noise problem, and stating that "[e]xcessive OHV noise disrupts daily life for nearby residents and degrades other visitors' recreation experiences"); AR09693 (Letter Re: UTV Takeover) (explaining that, due to increased traffic during a commercial OHV event, "recreational users outside of the event struggled to get to their destination"); AR08997 (2023 Feedback and Revisions for 2024 Permit) ("UTV Takeover volunteers were turning away day users from the open riding area without a wristband, even though the open riding area was open to the public."); AR08941 (Letter Re: UTV Takeover Curfew) (explaining that the UTV Takeover "will trigger an unusually large concentration of OHV activity within the event's permitted operating area" and "the excess noise from the increased OHV use will cause disturbances to adjacent landowners, other recreationists, and other resources"); AR08049 (UTV Takeover Meeting Notes) (describing congestion of people and vehicles during permitted events); Mangan Decl. ¶ 8, ECF No. 50 ("OHV intrusion into unauthorized areas and unchecked noise in excess of established decibel limits make it more difficult and less safe for me to recreate in the Dunes"). The Ninth Circuit has recognized that "[i]n addition to the physical impact of motorized vehicles on natural features of land, such vehicles transform remote areas into motorized recreation zones, substantially

Page 57 – OPINION AND ORDER

altering the outdoor recreation experiences of ORV users and non-users alike." *Oregon Nat. Desert Ass'n*, 625 F.3d at 1123.

The record shows that the Forest Service has not meaningfully managed or restricted commercial OHV activity to protect resources, public safety, or competing recreational uses. *See*, *e.g.*, AR08725 (2023 OHV Dunes Sound Project) (scoping instructions for the "Sound Project" directing that "'non-riding days' are not a viable alternative, nor is any sort of limited entry system, and the [Project team] should not consider these actions").

Because the Forest Service fails to "[r]estrict or prohibit" OHV activity "in areas not already restricted" to protect resources, including the marten, critical habitat, and other uses, the Forest Service violates FW-070. The permitting of the 2024 event and other commercial OHV events on the Dunes does not comply with the governing management plans and violates the NFMA.

D.    *Dunes Plan B-9 requires the agency to restrict OHV use to protect habitat*

Dunes Plan B-09 directs the Forest Service to "use signs and barriers where necessary to protect special habitats within and adjacent to [open riding areas]." AR03719 (Dunes Plan). The Forest Service contends that it "has required permittees to install signage and fencing for OHV events." USFS Resp. at 33.

The record shows that "unauthorized" intrusions into closed areas of vegetation and potential habitat during the events is a recurrent problem and that the nature of the events incentivizes such intrusions. The governing standards and guidelines imbue the Forest Service with the duty to protect listed species and their

habitat. The record shows that the Forest Service has declined to erect fencing to protect marten habitat and that its reliance on sign posting, delegated to the regulated party, has been strikingly deficient. *See*, *e.g.*, AR09221 (January 2024 Brooke letter) (stating that Forest Service does not use fences to protect marten habitat because "we have found this is not an effective deterrent method"); AR09244 (March 2024 NOI) (aerial photo of unrestricted OHV riding area showing vegetation obliteration and an adjacent area with intact vegetation that is closed to protect the snowy plover). Because the Forest Service has failed to implement and enforce meaningful protective measures to protect marten habitat, as required by Dunes Plan B-9, the Forest Service violates that provision of the Dunes Plan and the NFMA.

In sum, in issuing the 2024 SUP and other SUPs for commercial events on the Dunes, the Forest Service has not complied with the Plans' applicable standards and guidelines and violates the NFMA. "Agencies are entitled to deference to their interpretation of their own regulations, including Forest Plans." *Native Ecosystems Council*, 418 F.3d at 960. However, an agency's interpretation "does not control, where . . . it is plainly inconsistent with the regulation at issue." *Id.*; *see Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (explaining that no deference is due to an agency interpretation that contradicts the regulation's plain language). Further, courts "may not defer to an agency decision that 'is without a substantial basis in fact.'" *Id.*

Here, the Forest Service's determination that the issuance of the 2024 SUP and other SUPs comply with the governing management Plans is arbitrary and

Page 59 – OPINION AND ORDER

capricious and is set aside because it lacks substantial basis in fact, runs counter to the evidence, and is without reasoned explanation. Plaintiff is entitled to summary judgment on its NFMA claim.

V.    *Remedy*

Plaintiff is entitled to summary judgment on its ESA claims, its NEPA claim, and its NFMA claims. Plaintiff moves for vacatur and remand of the agency's unlawful decisions. Pl. Mot. at 35. Plaintiff requests that the Court "order the Forest Service to initiate, reinitiate, and complete consultation by a date certain" "to remedy the Forest Service's failure to analyze impacts to martens and their critical habitat." *Id.* at 36. Plaintiff also requests that no SUPs for commercial OHV events issue until the Forest Service completes consultation on both projects and complies with applicable law under ESA, NEPA, and NFMA. *Id.* Further Plaintiff seeks the imposition of interim measures "to mitigate ongoing harm to the vulnerable population of coastal martens living on the Dunes, as well as its habitats." *Id.* at 37.

Both parties request to confer and to provide briefing on injunctive remedy. Pl. Mot. at 38; Def. Mot. at 34.

Under the APA, "[t]he reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "Where a court holds an agency action unlawful, vacatur and remand is the default remedy under the APA[.]" *Mont. Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025).

Page 60 – OPINION AND ORDER

"[B]ut the court retains equitable discretion in 'limited circumstances' to remand a decision without vacatur while the agency corrects its errors." *Id.* (quoting *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012)). "Whether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Cal. Cmtys. Against Toxics*, 688 F.3d at 992 (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). That is, "courts may decline to vacate agency decisions when vacatur would cause serious and irremediable harms that significantly outweigh the magnitude of the agency's error." *League of Wilderness Defs./Blue Mountains Biodiversity Project v. United States Forest Serv.*, No. 3:10–CV–01397–SI, 2012 WL 13042847, at *2 (D. Or. Dec. 10, 2012).

Here, the Court has held arbitrary and capricious the "no effect" determination issued by the agency's BE, the "no effect" determination issued by the agency's CE, the agency's decision to apply a categorical exclusion, and the agency's determination that the issuance of SUPs for commercial OHV events on the Dunes complies with the Dunes and Forest Plans' standards and guidelines.

The seriousness of the agency's errors is grave. The Forest Service violated ESA's consultation requirement by failing to reinitiate consultation on the Routes Project and by failing to initiate consultation on the SUPs "at the earliest possible time[]," which, here, was the coastal marten's listing in 2020. 50 C.F.R. § 402.14(a) (2019). The coastal marten was listed in 2020. And this litigation commenced in 2024. It has been six years since the marten was listed as a threatened species and the

Forest Service still has not initiated consultation for either project. The agency's errors have caused an unreasonable and unjustifiable delay in consultation and environmental review. The Forest Service is imbued with the duty to conserve listed species and critical habitat. Yet, the record contains abundant evidence that the agency's actions not only increased the risk of jeopardy to a threatened species, but also that those actions facilitated the unnecessary destruction of habitat and public resources. On the other side of the equation, the disruption to the agency of vacating its unlawful decisions is minimal. At worst, the Forest Service may be required to mitigate harm to Dunes resources, which is already required by applicable law.

For that reason, the Court vacates the agency's unlawful decisions and remands the matter to the agency for a proper effects analysis and environmental review under ESA, NEPA, and NMFA. The Forest Service is also directed to initiate and complete consultation as to both projects. Finally, given the unreasonable delay in consultation and proper environmental review and given the risk of irremediable harm to listed species, habitat, and public resources, the agency shall issue no SUPs for commercial OHV events on the Dunes pending completion of lawful consultation and environmental review. *See Wash. Toxics Coal. v. EPA,* 413 F.3d 1024, 1035 (9th Cir. 2005) ("[T]he appropriate remedy for violations of the ESA consultation requirements is an injunction pending compliance with the ESA."); *Idaho Sporting Cong. v. Rittenhouse*, 305 F.3d 957, 974 (9th Cir. 2002) (instructing the district court to enjoin the logging project until the agency complies with NFMA and NEPA); Or. *Nat. Res. Council Fund v. Goodman*, 505 F.3d 884, 898 (9th Cir. 2007) (ordering district court

Page 62 – OPINION AND ORDER

to "promptly enjoin" project "until the Forest Service has corrected the NFMA and NEPA violations" that risk harm to the Pacific fisher).

The parties are directed to confer and file a proposed schedule by which consultation on both projects shall be completed.  The parties are also directed to confer and provide briefing as to further injunctive remedy.

Page 63 – OPINION AND ORDER

**CONCLUSION**

For the reasons explained above, Plaintiff's Motion, ECF No. 98, is GRANTED; the Forest Service's Motion, ECF No. 99, is DENIED; and Intervenor-Defendants' Motion, ECF No. 102, is DENIED.  The Court ORDERS as follows:

1.  Plaintiff's First ESA Consultation Claim.  Plaintiff is entitled to summary judgment on its ESA consultation claim as to the Routes Project.  The Forest Service violates ESA Section 7(a)(2) by failing to re-initiate consultation as to the Routes Project "at the earliest possible time" after the coastal marten was listed.  The Forest Service is ordered to reinitiate and complete consultation as to the Routes Project's effects on the coastal marten and its habitat.  The parties are directed to confer and to file a briefing schedule by which such consultation shall be completed.

2.  Plaintiff's Second ESA Consultation Claim.  Plaintiff is entitled to summary judgment on its ESA consultation claim as to the issuance of SUP for commercial event on the Dunes.  The Forest Service violates ESA Section 7(a)(2) by failing to initiate consultation as to the issuance of such SUP for commercial OHV event on the Dunes "at the earliest possible time" after the coastal marten was listed.
    a.  The Court concludes that the biological evaluation "no effect" determination is arbitrary and capricious and violates the ESA and the APA.  AR09442–47 (BE for CE).  The Court vacates that determination.
    b.  The Forest Service is ordered to initiate and complete consultation as to the effects of SUP for commercial OHV events on the Dunes on the coastal marten and its habitat.  The parties are directed to confer and to file a briefing schedule by which such consultation shall be completed.
    c.  The Forest Service shall issue no further SUPs for commercial OHV events on the Dunes until the Forest Service has lawfully completed consultation and complied with the ESA, NEPA, and the NFMA.

3.  Plaintiff's NEPA Claim.  Plaintiff is entitled to summary judgment on its NEPA claim.  The Forest Service violates NEPA by unlawfully applying a categorical exclusion and by failing to prepare an EA or EIS to analyze the effects of permitting a commercial OHV event on the human environment, including on the marten and its habitat and on the national recreation area.  The Court concludes that the CE's "no effect," "no extraordinary circumstance," and "no uncertainty" determinations are arbitrary and capricious and that the decision to apply a categorical exclusion is arbitrary and capricious.  AR09256–69 (CE).  The Court vacates those determinations.

The Court also vacates the agency's determination that it need not undertake further NEPA analysis as to the effects of such permit on the marten, its habitat, and the national recreation area.  Accordingly, the Court remands to the agency to undertake a proper environmental analysis under ESA, NEPA, and NFMA.  That analysis shall be completed prior to the issuance of further SUPs for commercial OHV events on the Dunes.

4.  Plaintiff's NFMA Claim.  Plaintiff is entitled to summary judgment on its NFMA claim.  The Forest Service violates NFMA by issuing SUP for commercial OHV event on the Dunes in violation of the Dunes Plan and the Forest Plan.  The Court concludes that the Forest Service's determination that issuing the SUP complies with the Plans' standards and guidelines was arbitrary and capricious.  The Court vacates that determination.

5.  Injunctive Remedy.  Plaintiff requests injunctive relief including interim measures pending the completion of consultation as to both agency actions and full compliance with applicable law.  The parties are directed to confer and to file briefing on injunctive remedy including interim measures.  The parties shall provide simultaneous briefs no later than September 9, 2026.  Response briefs are due September 23, 2026.  Reply briefs are due October 7, 2026.

6.  A hearing is scheduled for Monday, August 10, 2026, on Plaintiff's Motion for Preliminary Injunction, ECF No. 116, as to interim relief that can be provided to protect the coastal marten and its habitat until further injunctive remedy is determined.

It is so ORDERED and DATED this    9th    day of August 2026.


/s/Ann Aiken
ANN AIKEN
United States District Judge